John L. Smaha, Esq.        Bar No. 95855
Gustavo E. Bravo, Esq. Bar No. 218752
John Paul Teague, Esq. Bar No. 254249
**SMAHA LAW GROUP**
7860 Mission Center Court, Suite 100
San Diego, California 92108
Telephone:    (619) 688-1557
Facsimile:    (619) 688-1558

Attorneys for Debtor, Sargent Ranch, LLC

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>SARGENT RANCH LLC,<br><br>                Debtor. | CASE NO.  10-00046-PB11<br><br>Chapter 11<br><br>DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>Date:  May 17, 2010<br>Time:  11:00 a.m.<br>Dept:  4<br>Judge:  Hon. Peter W. Bowie |

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   FACTUAL SUMMARY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.  ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    Employment of Freeman Associates is Reasonable and Proper  . . . . . . . . . . . . 12

    B.    A Superpriority Priming Lien is Appropriate  . . . . . . . . . . . . . . . . . . . . . . . 13

        1.    Debtor has demonstrated an inability to obtai4
           credit elsewhere  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.    The Quarry Permitting Contract is within sound
           business judgment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        3.    All primed secured creditors are adequately protected  . . . . . . . . . . . . . 16

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES

*In re Charter Communications*
(Bankr. S.D. N.Y. 2009) 419 B.R. 221, 230  . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Chicago, Missouri and Western Ry. Co.*,
Bankr. N.D. Ill. 1988),90 B.R. 344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Delta Resources, Inc.*,
(11th Cir. 1995) 54 F.3d 722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Dallas Bank, N.A. v. O'Connor*
(10th Cir. 1987) 808 F.2d 1393, 1396-97 . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Dunes Casino Hotel*
(Bankr. D. N.J. 1986) 69 B.R. 784.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Devlin*
(Bankr. M.D. Fla. 1995) 185 B.R. 376, 378 . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Lee*
(Bankr. C.D. Cal. 1988) 94 B.R. 172) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Milham,*
(2nd Cir. 1998) 141 F.3d 420 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Mellor*
(9th Cir. 1984) 734 F.2d 1396, 1400 fn. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE
CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364

2

*In re Snowshoe Co., Inc.*
(4th Cir. 1986) 789 F.2d 1085, 1088. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Thrifty Oil Co.*
(Bankr. S.D. Cal. 1997) 205 B.R. 1009, 1014.) . . . . . . . . . . . . . . . . . . . . . . . 13

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*
(1988) 484 U.S. 365.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re  Hotel, L.L.C.,*
(Bankr. C.D. Ill. 2003) 295 B.R. 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Yellowstone*
2008 WL 5875547, 7 (Bankr. D. Mont., 2008). . . . . . . . . . . . . . . . . . . . 14,15,16,17,20

11 U.S.C. Section 327(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,20,21
(11 U.S.C. Section 361(3).) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,19
11 U.S.C. Section 364 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,11,13
11 USCA Section 364(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,16,21
Section 503(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
11 U.S.C. Section 506(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Section 507(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
11 U.S.C. Sections 1107 and 1108. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,10
(11 U.S.C. Section 327(a), (f)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,12

Pub. L. No. 95-598, 92 Stat. 2549 (1978).)  Subsection (d)(1)(A) . . . . . . . . . . . . . . . . . . . . . . 4

HR Report No 95-595, at 339 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
S Rep No 95-989, at 54 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
S Rep No 95-989, at 68 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
HR Rep No 95-595, at 356 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1    Debtor and Debtor-in-Possession, Sargent Ranch, LLC (the "Debtor"), hereby

2    brings its *Motion to Employ Freeman Associates and to Securitize Contract with*

3    *Superpriority Priming Lien* (this "Motion"), seeking to employ Freeman Associates as

4    permitting experts and to securitize the contract with the Debtor as a superpriority

5    priming lien under 11 U.S.C. § 364, with all fees and costs to be forwarded by Freeman

6    Associates.  The employment of Freeman Associates will constitute a substantial benefit

7    to the Debtor's estate and all its creditors.  This Motion is based on the attached

8    memorandum of points and authorities, the Declaration of Disinterest of Verne Freeman,

9    the Declaration of Wayne F. Pierce, the record

10    as filed with the Court, and all evidence or argument presented at the time of hearing.

11  **MEMORANDUM OF POINTS AND AUTHORITIES**

12    The Debtor hereby submits the following *Memorandum of Points and Authorities* in

13    support of its *Motion to Employ Freeman Associates and to Securitize Contract with*

14    *Superpriority Priming Lien.*

15

**I.**

16

**INTRODUCTION**

17    As the legislative history indicates, 11 U.S.C. § 364 provides a progressive method

18    for obtaining financing.  (See Pub. L. No. 95-598, 92 Stat. 2549 (1978).)  Subsection

19    (d)(1)(A) reiterates that the court will authorize the obtaining of credit if "the trustee is

20    unable to obtain such credit otherwise."[1]  Although a Chapter 11 debtor is protected from

21    creditors by the automatic stay, a fundamental concern is often obtaining additional funds

22    necessary to continue to operate its business.[2]  The sand quarry is one of numerous separate

23    projects and businesses that are envisioned in the Debtor's plan of reorganization, which

24    estimates paying off creditors 100%. These projects, however, require some degree of expert

25

26    [1] This section also applies to debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

27    [2] Creditors often react to the filing of a bankruptcy by restricting further credit transactions with the debtor.

28  Credit lines tend to evaporate and the debtor is often left struggling to source operational financing, exacerbating the debtor's pre-existing cash flow issues.

1   assistance in order to fully realize substantial increases in value that are part of the innate

2   potential of the Debtor's real properties.  In order to pay for the necessary expertise, the

3   Debtor needs to employ those experts and obtain credit to do so.

4           Debtor and Debtor-in-Possession, Sargent Ranch, LLC (the "Debtor"), seeks by this

5   Motion to employ a permitting expert.  The pending agreement with Freeman Associates

6   does not require any immediate payment from the Debtor until there are sales of sand from

7   the quarry, or when the property itself is sold. In return for its agreement to postpone

8   payment, Freeman Associates has negotiated a superpriority lien with the Debtor, which

9   would securitize the distribution portion of the applicable contract on the 250 acres of the

10  Debtor's properties that the agreement affects.  The agreement provides no other rights or

11  remedies to Freeman Associates.[3] Debtor believes this contract is a necessary element of the

12  developing plan.  Debtor's principal has spent many hours seeking alternate financing from

13  numerous institutional lenders, but has been unable to find credit during this continuing

14  capital drought.  The Quarry Permitting Contract, attached to the Declaration of Wayne F.

15  Pierce, is well within the sound business judgment of the Debtor, and the service to be

16  provided will substantially benefit the estate and increase the equity cushion protecting

17  existing secured creditors.  Further, the superpriority lien would only apply to the sale of the

18  sand from 250 acres of the Debtor's substantial real property assets (the "Quarry").[4] The

19  superpriority lien will give Freeman Associates a lien primed before all other secured

20  creditors as to proceeds from sale of the Quarry itself and/or its operations.  It is merely

21  meant to ensure initial distribution to Freeman Associates pursuant to the Quarry Permitting

22  Contract, and is not intended to be ahead of all claims of any classification, or as constituting

23  a claim to any other estate assets.           The Debtor has been unable to obtain alternate

24

25           [3]Freeman Associates will not possess *any* right to foreclosure or to possession of the real property.

26
             [4]The use permit to be obtain by Free Associates will be for a 250 acre site for the extraction of approximately
27  60,000,000 tons of construct grade sand and gravel. For the creation of the Quarry, there will need to be a lot line
    adjustment of parcels 810-38-014, 810-38-016 and 810-38-017. An approximate area of boundary adjustment is attached
28  to the Quarry Permitting Contract as Exhibit A.

1  financing of any form, and therefore, by this Motion, a superpriority priming lien is sought
2  to ensure compensation for Freeman Associates upon the sale of product from the active
3  quarry. The amount of such lien represents a tiny fraction of the equity cushion that will be
4  available to secured creditors and the Debtor from the value inherent in the maximized
5  utilization of the property's natural resources.

6                                                **II.**

7                                    **FACTUAL SUMMARY**

8          As previously presented to this court and as shown by a detailed land map provided
9  by the Debtor, the Debtor's various properties cover 6,400 acres on a plot of land that
10 stretches approximately five miles from east to west and reaches about three and a half miles
11 from north to south (See Exhibit H to the declaration of Wayne F. Pierce, a true and correct
12 copy of the property map). This impressive mass of land is separated into fourteen distinct
13 legal parcels. These fourteen separate legal parcels are further segmented into various uses
14 that can be independently sold to generate income to the Debtor with little or no impact and
15 all of which are currently allowed uses under the County property zoning and general plan,
16 specifically. (a) two separate areas where naturally occurring liquid asphalt is produced that
17 can be harvested for sale to construction materials companies ; (b) two specific areas which
18 have access to high wire transmission lines that would provide for installation of portable
19 solar facilities; (c) there are several separate areas suitable for habitat mitigation sales on a
20 per acre basis for the California Tiger Salamander and California Red-Legged Frog; (d) there
21 are over eight hundred acres suitable for habitat mitigation sales for riparian credits on a per
22 acre basis. These primary areas of business income are in addition to the existing naturally
23 occurring sand and gravel deposits discussed below. The vast array of different assets and
24 available uses for the Debtor's property gives the Debtor's bankruptcy a truly unique aspect.
25 (See Pierce Declaration, ¶ 16).

26         Through the Debtor's extensive efforts, there now exists a proven and confirmed "in
27 ground" asset of approximately 200,000,000 tons of construction grade sand and gravel. The
28 current contract Debtor seeks approval on calls for obtaining the necessary permits for the

1  extraction of approximately 60,000,000 tons of the available sand and gravel.  The Debtor's
2  confidence in this deposit is based on the results of two separate independent set of tests
3  performed and verified by Terrasearch, Inc. and Granite Construction Materials.    The
4  findings of Terrasearch, Inc. are confirmed and communicated by Terrasearch's letters of July
5  8, 2008 and June 17, 2009.  True and correct copies of these letters are attached as Exhibit
6  I.  Granite Construction Material's findings are represented by several core drilling samples
7  performed and obtained in June of 2007.  True and correct copies of these drilling samples
8  are attached as Exhibit J.  Volumetric analysis conducted by TerraSearch, based on the
9  borings and excavations has indicated the sand deposit to be approximately 200,000,000 tons
10  (with an in ground value of $2 a ton, a total value of over $400,000,000) on 1,200 acres.  A
11  deposit of sand of this quantity and quality make the reserve a regionally significant geologic
12  resource. (See Pierce Decl. ¶ 17).

13      Debtor has done everything within its power to move this project forward.  At this
14  point, the Debtor needs an influx of funds to proceed  with the permitting process and the
15  Quarry Permitting Contract provides such funds, forwarded by a professional company with
16  expertise in obtaining such permits, and allowing the Debtor to avoid any current payment
17  obligations.   The benefits of the Quarry Permitting Contract to the Debtor's estate and its
18  creditor *cannot be overstated*.  The increase in value of the Quarry once a permit is obtained
19  will be dramatic, and operations can commence soon thereafter.  Since the filing of this
20  bankruptcy, Debtor has been attempting to procure the necessary funds of approximately two
21  million dollars ($2,000,000) to begin the Use Permit process for a sand extraction facility on
22  a small portion of one of the various Sargent Ranch properties.  Prior to reaching a potential
23  agreement with Freeman Associates (attached to the Pierce Declaration as Exhibit A) Debtor
24  had been unsuccessful in its efforts.   All negotiations with Freeman Associates were
25  conducted at arms length and in good faith. (See Pierce Decl. ¶ 3).

26      As detailed in the Pierce Declaration, the Debtor had specific talks with no less than
27  fifteen investors, whether individuals, entities and/or lending institutions.  The Debtor's
28  specific dealings included:

DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE
CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364

///

1. The loan request from Owens financial was for a $2,000,000 1st trust deed super priority lien on a parcel of the Debtors parcel that was going to be used as a quarry. Mr. Dutra's response was that although they can fund $2,000,000 super priority liens, his company will not fund any loans that pertain to any quarry operations.

2. The loan offer from Ocean Pacific Capital was for a $2,000,000 1st trust deed super priority lien on 1,300 acres. He said it would be private hard money loan at 12-15% annual interest, 2-4 points to the Hard Money Lender and 2 points and $5,000 up front to Ocean Pacific Capital.

3. Lomas Partners provided the Debtor with a letter of intent for a $2,010,000 super priority lien on all of the debtors property. The terms were at a 25% annualized interest rate and 10% of all revenue generated from the sale or use of all the property. See Pierce Declaration, Exhibit B.

4. The Debtor approached Ranch Capital, LLC with a loan request for a refinance of the entire property and/or a DIP loan on the entire property. They reviewed the project documents and declined to move forward at this time.

5. The loan request to Seattle Funding Group was for a $2,000,000 super priority lien on the 1,300 acre parcel which was going to be permitted for a sand quarry. Seattle Funding Group responded that although they do DIP loans, they are not doing loans secured by land alone at this time.

6. The loan request to TCW Capital was for a new loan to payoff all existing lenders or, in the alternative, a debtor-in-possession loan. Ray Boone, who introduced the Debtor to TCW, informed me that TCW is not interested in land financing at this time.

7. The loan request to Vibra Bank was for a new first trust deed loan in the amount of $2,000,000 secured by 1,300 acres to be in a superpriority lien position. Dan Schon of Vibra Bank informed me that Vibra is not currently interested in making investments in Northern California.

8. The terms of the proposal from Mar Partners 2, LLC to facilitate the funding of the sand extraction use permit, was for "The purchase of a 20% ownership in the Debtor for $500,000 and to commit to contribute up to $4 Million dollars. The repayment terms in the agreement were: "MAR will receive a preferred return on its capital contribution equal to 5 times its commitment ($4,000,000 commitment times five equals $20,000,000 repayment). Therefore, under this proposal the sand extraction use permit costs of $2,000,000 would require a total repayment of $10,000,000. See Pierce Declaration, Exhibit C. (See Pierce Declaration, ¶'s 5-12).

The Debtor spent countless hours in telephonic and direct meetings with representatives of the above institutions. The Debtor discussed potential agreements for the Use Permit process, for potential buyouts of all secured creditors, for partnership agreements,

1  for the purchase and sale of various properties held under Sargent Ranch, for unsecured
2  loans, for secured loans and various other potential agreements. Although Debtor received
3  confidential letters of intent and various other potential offers, the Debtor has been unable
4  to finalize any agreements with the above identified institutions. Debtor will continue to
5  negotiate with a number of the above entities in an attempt to find further alternatives for the
6  Debtor to continue in operations, but the current agreement with Freeman Associates allows
7  the Debtor to move forward with its operations immediately and no other investor has offered
8  hard cash at this moment. (See Piece Declaration ¶ 13).

9        The claims bar date passed on April 9, 2010. In total, the claims received were for
10 $165,993,494.18 in secured claims, however, it appears that a number of these claims have
11 been filed twice or even three times. The Pierce Declaration, in paragraph 15, provides a
12 detailed discussion of how the claims provided by various parties seem to overlap at various
13 places and appear to be extremely inflated, raising issues of usury law violations and of the
14 intent of various creditors and parties pretending to represent creditors' interests. Regardless
15 of these duplicative claims, even if all these claims were assumed to be true, which would
16 be almost 3 times the amounts claimed due little over a year ago, the Debtor's real properties
17 and their extraordinary value are enough to provide an equity cushion two or even there times
18 the value of these creditors claims. Adding a $2,000,000 superpriority claim, on what will
19 eventually be only 250 acres of the 6,400 acres, should have little effect on the other creditors
20 in this case as the total claims of $165,993,494.18 would still pale in comparison to the
21 approximately $700,000,000.00 value of the Debtor's real properties. (See Pierce Declaration
22 ¶ 15).

23       The $700,000,000 estimate has been discussed by the Debtor previously in response
24 to a creditor's motion to have the matter identified as a Single Asset Real Estate (SARE)
25 bankruptcy and is discussed briefly above. The current motion to approve the contract with
26 Freeman Associates will bring the sand extraction project one step close to fruition for the
27 realization of the total sales value of the materials contained in what will be a 250 acre sand
28 extraction parcel. This parcel with approximately 60,000,000 tons of material has an in place

1  value of $120,000,000 (based on the TerraSearch report at $2 per ton in place) to an
2  extraction value in excess of $720,000,000 based on a gross sales value at $12 per ton. Even
3  if the questionable amount of secured claims of $165,993,494.18 hold up, this would
4  represent a respective secured claim against the subject 250 acre parcel totaling
5  $6,484,120.86 with against a parcel value of $120,000,000 ($164,993,494.18 divided by
6  6,400 acres equals a $25,936.48 per acre release amount, times 250 acres equals
7  $6,484,120.86). (See Pierce Declaration, ¶ 18).

8         In addition to the sand extraction site, as mention above, the Debtor's real properties
9  contain within them many acres of land that are available for Habitat Mitigation for various
10 forms of California wildlife.  The Debtor has obtained the necessary reports studies and
11 surveys to establish 804 acres of land that can be set aside for Riparian Habitat, 500 Acres
12 for Red-Legged Frog Habitat and 500 acres for California Tiger Salamander Habitat. Again,
13 this is not a blind assumption by the Debtor.  Attached as Exhibit K hereto is a true and
14 correct copy of a report issued by Live Oak Associates, Inc. on July 23, 2009, which
15 discusses two things.   First, the fact that the property anticipated to become the sand
16 extraction facility/quarry has no riparian and/or wildlife habitats that need to be protected.
17 Second, it also acknowledges the existence In Exhibit L, Live Oak Associates, Inc. values
18 the riparian habitat acreage alone at a potential value of $120,000,000 to $180,900,000. The
19 sale of these mitigation credits does not require any "development" and it does not require
20 any additional "work" on the Debtor's real properties.  The development of this business
21 would depend more on the hiring of staff to sell the credits and develop a methodology for
22 maintaining the properties sold as "protected' environments.  The Debtor believes the total
23 value of these business assets could and should be in excess of  $200,000,000. (See Pierce
24 Declaration, ¶ 19).

25         Taken as a whole, even if the filed secured claims stand the test of the usury issue, this
26 would equate to a $25,936.48 per acre release amount for said secured debt and the Debtor's
27 various real properties are reasonably worth the $700,000,000 valuation that the Debtor listed
28 as its value. Clearly placing a $2,000,000 superpriority lien ahead of $6,484,120.86 of

1  secured debt on a parcel with $120,000,000 in present value affords substantial equity and

2  benefit to the creditors and to the estate of the Debtor.

### III.

### ARGUMENT

5  Subject to court approval, the Bankruptcy Code authorizes the employment of

6  attorneys or other "professional persons" to represent and assist the trustee or debtor-in-

7  possession in carrying out its duties in the bankruptcy case. (11 U.S.C. § 327(a).) Freeman

8  Associates does not hold or represent an interest adverse to the estate, is disinterested, and

9  has not served as an examiner in the case.  (11 U.S.C. § 327(a), (f)) (See Freeman

10  Declaration, ¶ 2)  The firm is eminently qualified to perform the requisite permit due

11  diligence and application work, all of which will necessitate many hours spent drafting

12  documents, corresponding with officials, conducting research and ensuring compliance with

13  all applicable permit requirements. (See Freeman Declaration, Exhibit A).

14  As a result of Debtor's arms length negotiations with Freeman Associates and the

15  Debtor's current lack of liquid assets, the Debtor needs to immediately establish a

16  superpriority priming lien in an amount of the estimated use permit entitlement costs of

17  $2,000,000 as described in the Quarry Permitting Contract. The lien will represent a tiny

18  fraction of an asset with an estimated value over $700,000,000.  The Debtor believes this

19  credit facility is necessary given an inability to obtain credit elsewhere and the immediate

20  need to begin production at the sand extraction site for the benefit of all creditors.

21  Obtaining the requisite use permit is a sound business judgment that will greatly

22  enhance the value of the property such that any existing secured creditors will be fully

23  protected, thereby satisfying all requirements under Section 364 for the issuance of

24  superpriority liens. The value of the Quarry will, inarguably, be greatly enhanced.

25  The superpriority lien requested in this Motion will give Freeman Associates a lien

26  primed before all other secured creditors as to proceeds from sale of the Quarry itself and/or

27  its operations.  It is merely meant to ensure initial distribution to Freeman Associates

28  pursuant to the Quarry Permitting Contract, and is not intended to be ahead of all claims of

1   whatever classification, or as constituting any right to any other estate assets.  The amount
2   of such lien represents a tiny fraction of the value of the estate that will be available to
3   secured and unsecured creditors from the value inherent in the maximized utilization of the
4   property's natural resources.

5   A.      *Employment of Freeman Associates is Reasonable and Proper*

6          The Debtor has selected the firm of Freeman Associates because of its specific
7   experience in permitting various types of projects.  The firm has experience in obtaining
8   permits for land slated for development, mining or ecological conservation purposes.
9   Freeman Associates was also chosen due to its experience with dealing with locations
10  specific to northern California and with Santa Clara County in particular.  The Debtor is
11  making every effort to acquire requisite permits and fulfill certain requirements that the
12  County has made necessary in order to maintain the mining rights for the property upon
13  which the Quarry is to be located.  The overall work to be performed can be broken down
14  into the following phases:

15              Phase 1 - Geologic Investigation
16              Phase 2 - Project Definition and Preliminary Project Plans
17              Phase 3 - Early Consultation with Key Agencies and Officials
18              Phase 4 - Pre-Submission Conferences and Formal Application for Permit
19              Phase 5 - EIR Process
20              Phase 6 - Public Hearing - Santa Clara County
21              Phase 7 - Secondary Permits - SMG, ACOE, USFW, CDFG
22              Phase 8 - Site Work and Operation Start Up

23         To the best of the Debtor's knowledge, the firm of Freeman Associates and its
24  professionals have no connection with the creditors or any other parties in interest or their
25  respective attorneys and represent no interest materially adverse to the Debtor as
26  Debtor-in-Possession or to the estate in the matters upon which they are to be engaged as
27  expert advisors.  (See Declaration of Disinterest of Verne Freeman.).
28  ///

1   ///

2          Accordingly, the two-prong conflict of interest test of 11 U.S.C. 327(a) is satisfied.

3   The firm of Freeman Associates does not hold an interest adverse to the estate and is a

4   disinterested person. (See *In re Lee* (Bankr. C.D. Cal. 1988) 94 B.R. 172, 177.)  It holds no

5   economic interest that would tend to lessen the value of the bankruptcy estate or create an

6   actual or potential dispute with the estate or any predisposition of bias against the estate.

7   (See *In re Thrifty Oil Co.* (Bankr. S.D. Cal. 1997) 205 B.R. 1009, 1014.)  The firm of

8   Freeman Associates is not currently a creditor, equity security holder, or insider of the Debtor

9   and has no interest "materially adverse" to the interests of the estate or any class of creditors

10  or equity security holders.

11         It is the Debtor's intent to obtain the permits and fulfill all of the requirements of the

12  county's planning department so as to retain control of the property for the benefit of the

13  Debtor and all of its creditors.  If the Debtor is unable to obtain said permits and fulfill the

14  requirements of the county, the substantial benefit to the estate, in terms of a substantial

15  increase in value, and thus equity, will not be realized, the debtor's ability to reorganize will

16  be jeopardized, and the utilization of the property for this incredibly valuable purpose will

17  be unreasonably postponed.   Accordingly, the Debtor respectfully requests that the Court

18  enter an order authorizing Debtor to employ Freeman Associates.

19  B.      *A Superpriority Priming Lien is Appropriate*

20         The Code offers a variety of means through which a debtor can continue operations

21  between filing its petition and obtaining confirmation of its plan. 11 U.S.C. § 364 represents

22  an alternative to a debtor if it wishes to obtain the funds necessary to continue operations.

23  That section reads, in part, as follows:

24              (c)    If the trustee is unable to obtain unsecured credit
                       allowable under section 503(b)(1) of this title as an
25                     administrative expense, the court, after notice and a
                       hearing, may authorize the obtaining of credit or the
26                     incurring of debt--
                       (1)    with priority over any or all administrative
27                            expenses of the kind specified in section 503(b)
                              or 507(b) of this title;
28                     (2)    secured by a lien on property of the estate that is

---

DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE
CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364

1     not otherwise subject to a lien; or

2    (3) secured by a junior lien on property of the estate that is subject to a lien.

3   (d) (1) The court . . . may authorize the obtaining of credit or the incurring of debt secured by a

4     senior or equal lien on property of the estate that is subject to a lien only if--

5     (A) the trustee is unable to obtain such credit otherwise; and

6     (B) there is adequate protection of the interest of the holder of the lien on the

7     property of the estate on which such . . . lien is proposed to be granted.

8

9    To gain court approval of a Section 364(d) motion, there have generally been three

10 requirements: (1) there must be notice and a hearing; (2) the trustee must show that he is

11 unable to obtain credit otherwise; and (3) a level of adequate protection must be provided to

12 the displaced lienholders. Some cases have also required that the transaction be within the

13 Debtor's business judgment. (*In re Yellowstone* 2008 WL 5875547, 7 (Bankr. D. Mont.,

14 2008).) This means that the Debtor must also show that the relief under Section 364(d)

15 authorizing the obtaining of credit and the incurring of debt with a superpriority, will be of

16 significant benefit to the Debtor's estate and that the terms of the proposed loan are within

17 the bounds of reason, irrespective of its ability to obtain credit elsewhere. (See ergo, *In re*

18 *Devlin* (Bankr. M.D. Fla. 1995) 185 B.R. 376, 378 [Replacement of air conditioning unit,

19 boiler, and hot water heaters in debtor's hotel necessary to preserve value and thus loan from

20 debtor's mother granted superpriority status]; see also *In re Yellowstone* 2008 WL 5875547

21 (Bankr. D. Mont., 2008).)

22   1. ***Debtor has demonstrated an inability to obtain credit elsewhere***

23    Debtor's principal, Wayne F. Pierce, has demonstrated the Debtor's inability to obtain

24 credit elsewhere through efforts well beyond simple due diligence in his months-long effort

25 to obtain a $2,000,000 line of credit to cover the estimated cost of the permitting for the

26 Quarry. The current, prolonged recessionary environment has largely dried up capital in

27 general, but especially for bankrupt entities or individuals seeking to develop currently

28 planned projects. As the United States Bankruptcy Court of the Southern District of New

1   York has stated:

2   > Following the bankruptcy of Lehman Brothers Holdings, Inc.
    > on September 15, 2008, the global credit markets went into
3   > the financial cardiac arrest. Commercial lending came to a
    > virtual halt. Smart, sophisticated and otherwise confident
4   > business people panicked. No one who lived through the
    > period will ever forget the fear engendered by a worldwide
5   > crisis of confidence and the *inability to obtain credit by
    > conventional means. (In re Charter Communications* (Bankr.
6   > S.D. N.Y. 2009) 419 B.R. 221, 230 [emphasis added].)

7       This economic malaise remains ongoing, as became evident when the Debtor sought

8   financing throughout 2009. The financing is also vital to the Debtor as it will be used to

9   facilitate an integral portion of the Debtor's reorganization. Certainly, a debtor is not

10  required to seek credit from every possible source. (See *In re Snowshoe Co., Inc.* (4th Cir.

11  1986) 789 F.2d 1085, 1088.) A debtor need only show that it made a "reasonable effort" to

12  obtain post-petition financing from other potential lenders on less onerous terms and that

13  such financing was unavailable. (*In re Ames Dept. Stores* (Bankr. S.D. N.Y. 1990) 115 B.R.

14  34, 40; see also *In re Western Pacific Airlines, Inc.*, (Bankr. D. Colo. 1997) 223 B.R. 567

15  [Chapter 11 debtor-airline would be allowed to borrow aggregate of $30 million on

16  superpriority basis, in order to obtain financing needed to prevent immediate cessation of its

17  business and loss of value associated with its aircraft leaseholds; while terms of financing

18  were onerous, and included granting authority to lender to appoint directors to debtor's board

19  and to require debtor to assume and assign its leases, financing agreement was negotiated in

20  good faith, and debtor was unable to obtain such a loan, most of which was unsecured, on

21  any other basis.].)

22      Here, Mr. Pierce spent significant time and effort contacting in excess of fifteen (15)

23  separate institutions, detailing the plans with various individuals in those institutions,

24  receiving some interest, but, in the end, failing to obtain the necessary line of credit. (Pierce

25  Decl. ¶¶ 4-12.)    As in *In re Yellowstone*, supra, the Debtor has been unable, despite

26  tremendous effort to obtain any feasible operating credit. In that case, the debtor went back

27  and forth between several lenders, eventually finding all proposed financing inadequate.

28  (See *In re Yellowstone* 2008 WL 5875547, 6 (Bankr. D. Mont., 2008).) Likewise, without

1 alternate sources of funding, the Quarry Permitting Contract, which allows the Debtor to
2 avoid any current outflows and accomplishes the goal of obtaining an operational extraction
3 facility, constitutes an extremely valuable improvement to the estate and is the best option
4 going forward to realize the immense value of this natural resource.

5     2.     *The Quarry Permitting Contract is within sound business judgment*

6     The funding inherent in the Quarry Permitting Contract is needed to allow the Debtor
7 to maintain its current projections for commencement of operations in the sand extraction
8 facility. One of the preliminary environmental assessments that will need to be conducted
9 is a survey of the California Tiger Salamander. The survey season ends by the start of June,
10 and the survey should therefore be conducted as soon as possible. Beyond this, however, the
11 Debtor has an immediate and continuing need to obtain the superpriority financing and will
12 be unable to obtain financing on more favorable terms. The terms of the Quarry Permitting
13 Contract are fair and reasonable, and reflect the Debtor's exercise of prudent business
14 judgment. All negotiations were conducted in good faith. (Pierce Decl. 3¶; see also *In re*
15 *Yellowstone* 2008 WL 5875547 (Bankr. D. Mont., 2008).).)

16     3.     *All primed secured creditors are adequately protected*

17     There is a huge equity cushion inherent in the value of this property providing more
18 than adequate protection to all secured creditors. "The whole purpose in providing adequate
19 protection for a creditor is to insure that the creditor receives the value for which the creditor
20 bargained prebankruptcy. In determining these values, the courts have developed 'adequate
21 protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis."
22 (*Dallas Bank, N.A. v. O'Connor* (10th Cir. 1987) 808 F.2d 1393, 1396-97.) Where debtor
23 proposes to obtain financing by granting the postpetition lender a priming lien in collateral
24 securing another creditor's prepetition claim, debtor's proposal should provide the prepetition
25 secured creditor with the same level of protection that it would have had if there had been
26 no postpetition superpriority financing. (See *In re Windsor Hotel, L.L.C.*, (Bankr. C.D. Ill.
27 2003) 295 B.R. 307; see also *In re Chicago, Missouri and Western Ry. Co.*, (Bankr. N.D. Ill.
28 1988) 90 B.R. 344 [Chapter 11 debtor railroad allowed to incur secured debt under 11 USCA

1  § 364(d) where: (1) trustee had been unable to find other credit; and (2) although parties
2  differed as to whether debtor could supply adequate protection, debtor had reasonable
3  prospects of reorganization, loans were essential to continued operation of debtor, and loans
4  would enable debtor to improve service and would therefore have direct beneficial effect on
5  profitability].)

6       The enactment of the Bankruptcy Code in 1978 provided a statutory description, but
7  not an actual definition, for the phrase 'adequate protection.' Section 361 of the Bankruptcy
8  Code states that adequate protection can be provided in any one (or more) of three
9  nonexclusive methods. While the methods vary, they share a common theme: each method
10 mandates that the debtor take affirmative action in offering adequate protection, whether by
11 (1) 'requiring . . . cash payments,' (2) 'providing . . . an additional or replacement lien,' or
12 (3) 'granting such other relief . . . as will result in the realization of . . . the indubitable
13 equivalent' of the creditor's interest in the collateral.  (11 U.S.C. § 361(3).)  Thus, the
14 existence of any mandate to pay a secured creditor, simple interest or otherwise, has not been
15 universally observed by the courts, particularly when presented with requests by
16 'oversecured' creditors for adequate protection of their claims.  Here, the best way to
17 maximize the already oversecured nature of the creditors' claims is to maintain the Debtor's
18 going-concern value that will support full payment to all creditors over time. (See *In re*
19 *Yellowstone* 2008 WL 5875547, 9 (Bankr. D. Mont., 2008).)

20      An 'oversecured' creditor is a creditor whose collateral has a value greater than the
21 amount of the creditor's allowed secured claim. Because the methods of adequate protection
22 listed in section 361 are nonexclusive, other methods of providing adequate protection of the
23 oversecured creditor's interest in its collateral have occasionally been permitted. One such
24 method is the 'equity cushion.' Simply stated, an equity cushion exists when the value of the
25 collateral is greater than the amount of the creditor's claim against that collateral. (*In re*
26 *Mellor* (9th Cir. 1984) 734 F.2d 1396, 1400 fn. 2. ['"Equity cushion' has been defined as the
27 value in the property above the amount owed to the creditor with a secured claim, that will
28 shield that interest from loss due to any decrease in the value of the property during the time

1  the automatic stay remains in effect."].)  Although Equity Cushion analysis is traditionally

2  employed in requests for relief from stay, it is equally applicable to adequate protection

3  analysis employed by bankruptcy courts on a debtor's request to obtain financing through

4  incurring of debt secured by senior lien.  (*In re Dunes Casino Hotel* (Bankr. D. N.J. 1986)

5  69 B.R. 784.)

6         In this case, there is an enormous equity cushion in place by virtue of the inherent

7  potential of the sand extraction facility and the numerous other projects that depend on the

8  natural abundance of the land or previously planned residential or industrial development.

9  Without question, the amount of the equity cushion is a function of the value of the subject

10  collateral and the amount of the oversecured creditors' claims.  In this case the claims bar

11  date was April 9, 2010.  Taking all claims at face value, total secured claims are estimated

12  at $165,993,494.18.[5]  The estimated value of the sand extraction potential of the Debtor's

13  real properties alone is estimated "in ground" at $400,000,000 or $2.00 per ton, with an

14  estimated 200,000,000 tonnes available on approximately 1,000 acres in total. (Pierce Decl.

15  at Exhibit I.)  The total value of the Debtor's projects available on its real properties totals

16  over $700,000,000.  Therefore, secured creditors have an equity cushion of over four-fold.

17  Regardless of the methodology of valuation, whether fair market, going concern, or

18  liquidation, the $2.4 billion extracted value of the sand and gravels *alone* provides a

19  substantial cushion to all creditors.[6]

20         Considering either the amount of the claims of the creditors or the value of the Quarry

21  ───────────────────

22         [5]This amount is heavily disputed. The Debtor believes that the actual amount is closer to the

23  approximately $80,000,000 as set forth in Claim No. 56.  In that proof of claim, the Debtor believes

24  that the filers combined the interests of various creditors, some of whom they did not represent and

25  who had already filed proof of claims on their own behalf.  Therefore, there is significant duplication

26  of claims.

27         [6]Indeed, certain creditors have expressed an interest in acquiring the property and taking full

28  advantage of the properties themselves, at the expense of the Debtor and other creditors.

1  and the Debtor's other property, the $2,000,000 superpriority lien is minuscule by

2  comparison. It hardly behooves the secured creditors to argue that, by virtue of 11 U.S.C.

3  § 361, the Debtor should not be able to use, sell, lease, or borrow against such property, until

4  adequate protection is furnished to them when the Quarry alone can satisfy the majority of

5  all claims. Irrespective of the specific means for adequate protection to be employed,

6  however, any application of section 361 necessitates a determination of the rights of a party

7  seeking adequate protection, meaning that one must value the property of the estate in which

8  the moving party claims an interest needing protection. (See 11 U.S.C. § 506(a).)

9  Ultimately, the standard of valuation to be employed in a given case must turn upon the

10  particular circumstances involved. (See ergo HR Report No 95-595, at 339 (1977); see also

11  S Rep No 95-989, at 54 (1978); S Rep No 95-989, at 68 (1978); HR Rep No 95-595, at 356

12  (1977) [ Usually, a "going concern" valuation is appropriate.].)

13        If a secured creditor is oversecured, the secured creditor will be entitled to postpetition

14  interest, but payment of that interest is not required early in the case in order to provide

15  adequate protection. (See *In re Delta Resources, Inc.*, (11th Cir. 1995) 54 F.3d 722

16  ["payment of accrued postpetition interest to an oversecured creditor [must] await the

17  completion of reorganization or confirmation of the bankruptcy case"]; see also *In re

18  Milham*, (2nd Cir. 1998) 141 F.3d 420 ["On the date of confirmation, the allowed claim of

19  an oversecured creditor is augmented by the inclusion of section 506(b) pendency interest."].)

20  The court may therefore reject any request for payment of adequate protection payments if

21  the estate does not have the economic ability to make the periodic payments.

22        The U.S. Supreme Court held that the "indubitable equivalent" standard for adequate

23  protection does not require that even an *undersecured* creditor receive periodic interest

24  payments to compensate it for being deprived of the use of the proceeds that could have been

25  obtained if the right to immediate foreclosure on their collateral had not been delayed by the

26  automatic stay. (See *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*

27  (1988) 484 U.S. 365.) In the final analysis, however, whatever relief is actually proposed, it

28  will still be the duty of the bankruptcy judge to balance the equities under the circumstances

1  rather than to adhere to rigid and inflexible tests.

2        In this case, the Debtor's going concern value "will be preserved at absolutely no cost
3  or risk to" secured creditors. (See *In re Yellowstone* 2008 WL5875547, 11 (Bankr. D. Mont.
4  2008).)  This case is similar to *In re Yellowstone* in that, as in that case, the best way to
5  maximize the value of Debtor's assets is to maximize the Debtor's going-concern value.
6  (See *In re Yellowstone* 2008 WL5875547 (Bankr. D. Mont. 2008).)  In *Yellowstone,* expert
7  analysis demonstrated that proposed financing included funding of up to $800,000 for the
8  Debtor to pursue an easement that was currently in escrow. Loss of that easement could have
9  resulted in the Debtor's inability to plat a substantial portion of its real property and the
10  Debtors' loss of the easement would adversely affect all parties involved.  Likewise, this
11  permitting process must eventually be accomplished. Postponing it will irrevocably harm the
12  Debtor and create unnecessary costs that will not benefit anyone.

13        The current motion to approve the contract with Freeman Associates will bring the
14  sand extraction project one step closer to fruition for the realization of the total sales value
15  of the materials contained in what will be a 250 acre sand extraction parcel. This parcel with
16  approximately 60,000,000 tons of material has an in place value of $120,000,000 (based on
17  the TerraSearch report at $2 per ton in place) to an extraction value in excess of
18  $720,000,000 based on a gross sales value at $12 per ton. Even if the questionable amount
19  of secured claims of $165,993,494.18 hold up, this would represent a respective secured
20  claim against the subject 250 acre parcel totaling $6,484,120.86 against a parcel value of
21  $120,000,000 ($164,993,494.18 divided by 6,400 acres equals a $25,936.48 per acre release
22  amount, times 250 acres equals $6,484,120.86). Clearly placing a $2,000,000 superpriority
23  lien ahead of $6,484,120.86 of secured debt on a parcel with $120,000,000 in present value
24  affords substantial equity and benefit to the creditors and to the estate of the Debtor. The fact
25  that the services of Freeman Associates will only help to increase the Debtor's ability to
26  realize this value, only makes this motion a further benefit to the Debtor and each and every
27  one of its creditors.  Therefore, the Debtor requests that the Court enter an order granting a
28  superpriority priming lien benefitting Freeman Associates and subject to all the limitations

1   discussed herein.

2                                    **IV.**

3                            **<u>CONCLUSION</u>**

4       Debtor prays to be authorized pursuant to 11 U.S.C. §327(a), to employ and appoint

5   Freeman Associates   to represent the Debtor as Debtor-in-Possession in obtaining all

6   necessary permits and other requirements of the county's planning department, and for a

7   superpriority priming lien pursuant to 11 U.S.C. § 364(d) as necessary to the estate and a vital

8   element in fully realizing a vital element of the Debtor's Plan of Reorganization.

9

10   Dated: April 19, 2010                     */s/ John L. Smaha*

11                                     John L. Smaha
                                         SMAHA LAW GROUP,

12                                     Counsel for Sargent Ranch, LLC,
                                         Debtor and Debtor-in-Possession

13

14

15   W:\Sargent Ranch\Motion.Freeman\102.Motion.Employ.Freeman.w-table.wpd

16

17

18

19

20

21

22

23

24

25

26

27

28

---