John L. Smaha, Esq.          Bar No. 95855
Gustavo E. Bravo, Esq. Bar No. 218752
John Paul Teague, Esq. Bar No. 254249
**SMAHA LAW GROUP**
7860 Mission Center Court, Suite 100
San Diego, California 92108
Telephone:    (619) 688-1557
Facsimile:    (619) 688-1558

Attorneys for Debtor, Sargent Ranch, LLC

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>SARGENT RANCH LLC,<br><br>              Debtor. | CASE NO. 10-00046-PB11<br><br>Chapter 11<br><br>DEBTOR'S CONSOLIDATED REPLY IN SUPPORT OF MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>Date: May 17, 2010<br>Time: 11:00 a.m.<br>Dept: 4<br>Judge: Hon. Peter W. Bowie |

///
///
///
///
///
///
///
///

---

DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE
CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364

**TABLE OF CONTENTS**

Page

I. CONTENT OF OPPOSITIONS .................................................. 1

II. FACTUAL AND LEGAL ARGUMENT ........................................ 2

    A. Debtor's Motion Is Not Premature ....................................... 2

    B. Debtor's Valuation is Supported by Valid
       Testimony and Third Party Evidence ................................... 6

    C. The Amount of Debt For the Secured
       Claims is Irrelevant. ...................................................... 9

    D. The Claim That A Sale Should Have Occurred
       By Now is Disingenuous ................................................ 10

    E. Debtor's Alleged Wrongdoings are Irrelevant to this
       Motion and to this Case in General .................................... 11

    F. Debtor Has Established Grounds for
       Section 364(d)(1) for Superpriority Financing ...................... 12

    G. The Success Fee Would Belong To Freeman
       Associates Alone ......................................................... 13

    H. Employment of Freeman Associates is Necessary and
       Reasonable Given the Circumstances ................................. 13

III. CONCLUSION ................................................................. 14

**TABLE OF AUTHORITIES**

*In re Hungerford*
(Bankr.D.Mont.2001) 19 B.R. 103, 118-19) .................................. 7

*In re Plummer*
(Bankr.D.Mont.2003) 20 B.R. 468, 478 ...................................... 6

*In re Wilson*
(Bankr.D.Mont. 2007) 378 B.R. 862) .......................................... 7

*In re Yellowstone*
2008 WL 5875547 (Bankr. D. Mont., 2008) ................................. 3

*South Central Livestock Dealers, Inc. v. Security State Bank of Hedley, Tex.*
(5th Cir.1980) 614 F.2d 1056, 1061) .......................................... 6

**BANKRUPTCY CODES**

Page

11 U.S.C. § 364(d) .................................................................... 4

11 USC Section 364(d)(1) ........................................................ 12

11 USC Section 503 ................................................................. 13

507 11 U.S.C. §327(a) .............................................................. 13

**OTHER**

Hon. Barry Russell, Bankruptcy Evidence Manual, 2000 ed. § 701.2 ................. 6

W:\Sargent Ranch\Motion.Freeman\110.TOC-TOA.wpd

Debtor and Debtor-in-Possession, Sargent Ranch, LLC (the "Debtor"), hereby provides its consolidated reply to the three oppositions filed against its motion to employ Freeman Associates and to Securitize the Contract with a Superpriority Priming Lien pursuant to 11 USC Section 364. The oppositions were filed by Jeffrey J. Goodrich on behalf of an as yet undefined and unspecified "group" of investors from the first priority lien, the Sylversters, three individual creditors and one creditor, Energy Research & Generation, Inc. ("ERG"). Another small group of investors, the Kralik creditors, made up of five individuals, joined in ERG's opposition.[1] The oppositions that were filed bring up several repeating points, all of which are responded to herein below. However, the Debtor thinks it important to note an overall theme in these oppositions, namely, that these few creditors are intent at pulling at creditor from opposite directions, seeking to push the Debtor into a zone of inactivity for their end purpose of gaining the Debtor's properties for their personal benefit over that of other creditors, especially unsecured creditors and equity holders.

## I.

## CONTENT OF OPPOSITIONS

The three oppositions filed to Debtor's Motion to employ Freeman Associates and to securitize the contract with a superpriority priming lien raise many of the same issues. However, it is the fine line that the opposing parties try to walk that stands out in each opposition. The oppositions filed are masterpieces in contradictions and warring positions within each opposition.

The opposing creditors complaint that the Debtor has done nothing over the past several years to move the real properties in question forward and to develop the various

---

[1] It is interesting to note that only a total of ten lienholders filed an opposition to this motion. Of the more than one hundred secured creditors, only these four small groups oppose the Debtor's efforts to move this case forward. This seems a far cry from ERG's claim that the secured creditors are united in their opposition to this motion, to this bankruptcy and to the Debtor's efforts in general.

DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE
CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364

1

business opportunities available on these same properties.[2] At the same time, the opposing creditors now ask the court to delay and/or deny the very same progress that the opposing creditors seem to be clamoring for. Further, opposing creditors seem to suggest that some of the work should be done, even offering to pay for some of this work, but then claim that other portions of the work need not be done, without offering any details as to why some of the work is more important in their eyes to the rest. Debtor is willing to consider any offers to provide funds for work to be done, however, given the nature and terms of the creditors' previous loan advances, Debtor has no doubt that any advancement of loans will come with exorbitant interest rates and harsh terms.

    The opposing creditors also attempt to challenge the valuations that the Debtor has determined for the real properties, they do so by claiming that no evidence exists to support these values, ignoring the production of an entire workbook of third party reports and analysis that establish the existence of the Debtor's valuable assets. Further, opposing creditors attempt to present the improper opinion testimony of individuals like retired Rear Admiral Benson, who is not an expert on real estate, is not an owner of the real properties and who may not have ever stepped foot on any of the Debtor's real properties in his life, to provide his opinion on the value of the real properties while challenging the managing member's opinion on valuation. Despite their criticism of the Debtor's valuations, the opposing creditors have shown, through their efforts to have the Debtor determined a Single Asset Real Estate case and through these oppositions, that their main goal in this bankruptcy is to wrest control of the real properties away from the Debtor and to establish their own equity group to take advantage of the very same values that they challenge.

    The opposing creditors raise eight specific arguments against the employment of Freeman & Associates and the priming of Freeman Associates' lien as a method of funding the necessary work of Freeman & Associates. The issues can be summarized as follows: 1.

---

[2] As explained in further detail below, the reason for the Debtor's apparent inability to develop these businesses was the creditors' frequent refusal to provide per acre releases to the Debtor so that he could develop and/or sell portions of the Debtors' real properties to pay down the creditors' claims.

DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE
CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364

2

The motion is premature; 2. The valuation of Debtor's assets is not correct; 3. The amount of debt is not properly calculated; 4. Previous failure to sell; 5. The Debtor's manager's ability to manage the Debtor based on his previous efforts; 6. That 11 USC Section 364 has not been satisfied; 7. That the Success Fee negotiated and contracted for by Freeman & Associates is a veiled attempt to get Wayne F. Pierce funds; and, 8. That the Debtor's motion somehow seeks to circumvent the employment process under Bankruptcy Law. The Debtor hereby responds to each of these issues in turn.

## II.

## FACTUAL AND LEGAL ARGUMENT

Debtor believes the work of Freeman Associates is a necessary step in the Debtor's reorganization. It puts in motion a permitting process that, once completed, will provide additional evidence of the incredible value that the potential sand extraction facility has and needs to be realized. The opposing creditors' issues, while possibly appearing to be valid arguments, have no substance behind them.

A.   *Debtor's Motion Is Not Premature*

The opposing creditors claim that there is no need to begin the permitting process at this time and that they need additional time to consider the valuation issues of the Debtor's real properties and how the project is being funded. The Debtor's motion provides two specific reasons why the project needs to move forward. First, one of the preliminary environmental assessments that will need to be conducted is a survey of the California Tiger Salamander. The survey season ends by the start of June, and the survey should therefore be conducted as soon as possible (See Debtor's Motion, pg. 16, ll. 7-9 and the Declaration of Wayne F. Pierce in support to Debtor's Motion, ¶ 3). In addition, the Debtor pointed out in its motion that the Debtor is provided a broad level of leeway in exercising its prudent business judgment (See Debtor's Motion, pg. 16, ll. 11-14, citing to *In re Yellowstone* 2008 WL 5875547 (Bankr. D. Mont., 2008). A debtor in a chapter 11 bankruptcy is entrusted with the duty to continue operations of the debtor and to move the debtor towards a plan of reorganization that will maximize the value of the debtor's assets for the benefit of the

DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364

3

bankruptcy estate and its creditors. As pointed out by Debtor in its motion, a debtor in a chapter 11 is entitled to exercise its prudent business judgment to maintain operations and to move a case along. The Debtor, after continued and extensive efforts to find other alternative forms of financing, identified the offer of Freeman Associates as the best, most prudent method available to move this case forward. As such, the Debtor's Motion is in no way premature and should be granted based on the arguments provided in the Debtor's Motion.

In addition to those arguments previously presented by the Debtor, perhaps the most important reason to commence the permitting process at this time is to take advantage of perceived support for the permit from the current supervisors and county staff for the County of Santa Clara. The Debtor has spent a substantial amount of time laying the groundwork for the permitting process and the Debtor believes it has a promising outlook for the permitting process with the current supervisors for the County of Santa Clara. These supervisors' terms come to an end in November of this year and it is in the Debtor and all interested parties' best interest to bring the permit request before this group of supervisors and to seek approval at this time (See Declaration of Wayne F. Pierce in Support of Reply, ¶ 2). If the Debtor is forced to delay further, the supervisors in office will be new and will have little or no knowledge of the Debtor's properties or the value of the potential sand extraction site. This delay will only create additional risk to the Debtor and to the secured creditors, who depend upon the value of the Debtor's real properties.

Obtaining the permit would also allow the Debtor's bankruptcy case to move forward and would provide the framework for a workable plan of reorganization. It is important to note that obtaining the permit will not increase the amount of available sand for extraction on the two hundred and fifty acre lot. Having the permit in hand, will make the use of that sand immediately available and will clear the road for the development, lease and/or sale of the lot to interested buyers. In short, the lot will be that much more desirable to potential investors and/or buyers by removing a potential risk and adding a guaranteed constant of county permission to begin extracting the sand. With the permit in place, the Debtor believes,

based on its previous discussions and dealings with concrete suppliers, that offers to lease, buy or invest in the 250 acre lot would be presented to Debtor shortly thereafter. In fact, the Debtor had previously been in discussions with at least one company, Granite Construction Company, on the lease of much the same area for sand extraction. Those negotiations were thwarted by the secured creditors by and through their refusal to provide per acre releases (See Declaration Wayne F. Pierce in Support of Reply, ¶ 3 and Exhibit A thereto, a true and correct copy of correspondence from Granite Construction Company).

Another question to ask in contemplating the opposing creditors' claim that the pending Motion is premature is to ask the question: if not now, when? The opposing creditors claim they need more time to conduct discovery into the valuations provided by the Debtor and to conduct a deposition of Mr. Verne Freeman to obtain further information. The opposing creditors fail to acknowledge the fact that the Debtor's valuation was provided to this Court and to each and every creditor on March 1, 2010 as part of Debtor's opposition to the SARE motion. Creditors have had all of March, all of April and part of May to conduct an examination of Mr. Pierce and to request further evidence, no such request has been made of the Debtor or Mr. Pierce. Jeffrey J. Goodrich claims he made a personal, informal request for limited documentation at a Section 341 meeting of creditors. Debtor's counsel was present at the meeting of creditors and specifically recalls informing Mr. Goodrich that documents could be produced upon written request. No such written request was received and Mr. Goodrich has since failed to appear at two subsequent meetings of creditors. (See Declaration of Gustavo E. Bravo, ¶ 2). If they haven't taken the opportunity to conduct this discovery in the previous two to three months, why should the Debtor and other creditors suffer the consequences of delaying this motion to allow them to do so now? The opposing creditors do not provide a timeline for when they would allow this motion to go forward. They offer no alternatives. The Debtor's only logical conclusion is that the opposing creditors would like the permitting process to occur only after the Debtor has lost these properties to the same opposing creditors so they can reap the benefits of such a process. This is not the purpose of a chapter 11 reorganization and the court should not allow these,

few opposing creditors to effectively bog down the Debtor and prevent him from moving this case forward.

There is no doubt, the Debtor is aggressively moving this case forward. In addition to the pending motion, prior to the hearing on this matter, the Debtor expects to have three further motions before this court. The first, already provided to the United States Trustee for a statement of position, calls for the authority to employ the real estate brokerage firm of Cassidy Turley to list the majority of the Debtor's real properties for sale. The second will be a motion to set release prices for various lots owned by the Debtor in order to prevent certain secured creditors from again preventing the Debtor from seeking potential buyers, lessors and/or investors to develop portions of Debtor's real properties. Finally, the Debtor shall be bringing a motion to approve an agreed upon contract to sell a portion of Debtor's real estate properties to a third party for the development of a solar facility for the purchase price of $1,200,000. (See Declaration of Gustavo E. Bravo, ¶ 3). The current motion, along with these soon to be filed motions, is Debtor's reasonable and good faith attempt to get creditors paid off in full.

B.    *Debtor's Valuation is Supported by Valid Testimony and Third Party Evidence*

It is well established law that for purposes of valuation, an owner is competent to give his or her opinion on the value of his or her property, most often simply by stating the conclusion without stating a reason. See *Hon. Barry Russell, Bankruptcy Evidence Manual, 2000 ed. § 701.2*; See also *South Central Livestock Dealers, Inc. v. Security State Bank of Hedley, Tex.*, (5th Cir.1980) 614 F.2d 1056, 1061). In the instant case, the Debtor has done just that, by providing the declaration of Wayne F. Pierce in support of the Debtor's valuation. Wayne F. Pierce has been the managing member of the Debtor since its inception and certainly since the Debtor obtained the subject properties. Mr. Pierce has always been intimately involved in the development of the Debtor's properties and is, perhaps, most qualified to testify as to its value.

While a debtor's estimate of value may be acceptable, the Court may reduce the value of an opinion if not based upon sufficient facts. (*In re Plummer*, (Bankr.D.Mont.2003) 20

B.R. 468, 478; *In re Hungerford*, (Bankr.D.Mont.2001) 19 B.R. 103, 118-19). In the instant case, despite the opposing creditors' claim to the contrary, the Debtor and Mr. Pierce have had substantial information and available facts to develop the valuation. Among these previously produced facts and evidence are:

- The Morrison & Foerster opinion letter dated September 14, 2004 (attached as Exhibit A to the Debtor's Notice of Lodgment in Support of Reply);
- The Certificates of Compliance issued by Santa Clara County (attached as Exhibit B to the NOL);
- The projected value of sand deposits letter of opinion prepared by Terrasearch, Inc., dated June 17, 2009 and providing an estimated value for the sand at $400,000,000 based on core drilling samples prepared by Granite Construction Materials (attached as Exhibit C to the NOL);
- Opinion letter of Live Oak Associates, Inc., dated November 21, 2007, providing a value for the total riparian preservation credits at a value of $120,600,000 to $180,900,000 (attached as Exhibit D to the NOL); and,
- The Tar Creek Study and Sargent Oil Field study performed in 2002, identifying deposits of oil, liquid asphalt and gas deposits in the Debtor's real properties (attached as Exhibit E to the NOL).

Clearly, the Debtor is not just "talking his book" and the Debtor's valuation is not merely a valuation based just on his personal opinions. Also, the Debtor reminds the court that this evidence was presented to the court on March 1, 2010 and the creditors have had an opportunity to review these items and have not questioned the Debtor about these reports and evidence to date.

Where a debtor's estimate of value is the only evidence provided before the court, that testimony is conclusive. (See *In re Wilson*, (Bankr.D.Mont. 2007) 378 B.R. 862). In the instant case, the only evidence brought by the opposing creditors to counter the Debtor's valuation is the declaration of retired Rear Admiral Benson. Admiral Benson is not identified as an expert. He is not an owner of the Debtor's real properties. He does not claim

DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364

7

to have any personal knowledge regarding the Debtor's properties. Simply put, the court has no basis upon which to give Admiral Benson's testimony any weight whatsoever[3]. As such, the court should find Mr. Pierce's testimony conclusive weight and determine that the opposing creditors, indeed all secured creditors, are more than adequately protected by the value of the Debtor's real properties.

In addition to the above information, the Debtor believes that recent developments only serve to further support the Debtor's valuation of its real properties. The fact that Cassidy Turley has agreed to represent the Debtor in the potential sale of most of the Debtor's real properties indicates that Cassidy Turley believes that there is substantial value in the Debtor's properties. Otherwise, Cassidy Turley would have no incentive to spend its time, money and efforts to market the properties to interested buyers. Also, Debtor has entered into a contract, subject to court approval, to sell the first lot of 120 acres for the development of a solar power facility with a sale price of $1,200,000 with the Debtor retaining easements to develop the property for other uses, providing the Debtor further value to the agreement. Finally, the willingness of Freeman Associates to take on this permitting process without receiving a penny in reimbursement until the sand extraction lot is sold and/or developed, further provides evidence that third parties trust the valuations of the Debtor. If Freeman Associates did not believe the sand is "in ground" and that the permit is not reasonably likely to be given, it would not risk its own money and efforts to obtain the permit.

The opposing creditors, especially, Admiral Benson, spend significant amount of time doubting Debtor's specific business opportunities. Among these, Admiral Benson claims that the solar facility opportunity was completely in Debtor's mind and were "plucked from

---

[3] If the Court were to consider Admiral Benson's declaration as admissible evidence relating to the Debtor's property, the Debtor would have substantial grounds to attack Admiral Benson's valuations. In briefly reviewing the comparable sales that Admiral Benson relies upon, it is immediately clear that none of the properties are remotely comparable to the Debtor's real properties. None of the properties used by Admiral Benson have recorded certificates of compliance, a number of them fall under the Williamson Act, preserving agricultural lands, most have no utilities and/or water to speak of, and all are nowhere near Highway 101. If the court considers Admiral Benson's declaration, the Debtor would request an opportunity to respond at the May 17th hearing as to these and further errors.

thin air" (See Opposition of ERG, pg. 5, ll. 14-15). The fact that there is now, in existence, a pending contract to sell this business opportunity at $1,200,000 exemplifies the lack of a valid argument by Admiral Benson and the other opposing creditors. Cassidy Turley's pending employment will further paint Admiral Benson's and the other oppositions into a much more negative light.

C.   *The Amount of Debt For the Secured Claims is Irrelevant.*

The opposing creditors raise the issue of the Debtor's valuation of the amount of debt that the secured creditors hold. The Debtor addressed this issue in its motion papers. The Debtor acknowledged that filed secured claims total $165,993,494.18. The opposing creditors's only analysis, provided by ERG provides a total claim of $157,111,255.77. Under either value, the Debtor's real properties provide a substantial equity cushion to the secured creditors. The issue of the amount of debt, at least for purposes of this motion, is moot.

The ongoing problematic issues for the opposing creditors can, therefore, be left for another day. For example, the Debtor is analyzing the debt instruments and the involvement of so many individual trustees to determine if the loans, which apparently earn interest at a rate between 15% and 30% depending on which creditor you ask, are usurious or were otherwise in violation of other provisions of state and federal law. Debtor believes objections to the claims of secured creditors may be necessary. Also, the declarations of Mr. Goodrich and Admiral Benton seem to ignore the significant payments of interest, and possibly principal, that were paid by the Debtor over the first few years including pre-paid interest. Finally, there is an odd claim by Mr. Goodrich that Mr. Pierce allegedly received over $11,000,000 from the Debtor. Although Mr. Pierce was contractually entitled to receive a salary from the Debtor throughout the eleven years that the Debtor has existed. Mr. Pierce did receive some funds, approximately $3,000,000, however, the remainder of the alleged funds paid to Mr. Pierce, were, in fact, accrued management fees that were **never** paid to Mr. Pierce. Further, Mr. Pierce has put in over $400,000 of his own money to fund various projects in the last few years and has worked full time for the Debtor without compensation

DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364

9

at least since the filing of this case and for several years before.[4] (See Declaration Wayne F. Pierce in Support of Reply, ¶ 4).

D.  *The Claim That A Sale Should Have Occurred By Now is Disingenuous.*

The opposing creditors raise a question that would appear to be valid on its face, if the sand extraction facility is so valuable why hasn't it been sold before, or the surrounding properties for that matter. The answer that the opposing creditors apparently hope to hear is, it was because Debtor was either mismanaged or because the value simply isn't there. The truth of the matter is, the Debtor has discussed the real properties with potential buyers, investors and lessors on a myriad number of occasions over the last several years. However, it has been a number of the secured creditors, likely led by some of the opposing creditors in this motion, that have prevented the development of these properties. By refusing to provide the Debtor with set per acre release prices on several occasions, the secured creditors prevented the Debtor from developing, selling and/or leasing any portion of the real properties because these same creditors insisted upon being paid in full, or not at all. This unwillingness to work with the Debtor, and the potential issue of usury, have allowed the creditors to allegedly triple their principle investments. (See Declaration Wayne F. Pierce in Support of Reply, ¶ 5 and Exhibit B to said declaration, a true and correct copy of an e-mail string providing the creditors' refusal to allow per acre and/or per lot releases).

At this point in time, the Debtor believes it can utilize the protections and options provided by the Bankruptcy Code to allow it to proceed with the sale of the real properties. As such, the Debtor has entered into an agreement with Cassidy Turley to list and market the properties for sale. Also, the Debtor has, in just a few short months, found a bonafide purchaser for at least one lot, and will shortly file its motion to sell this lot for $1,200,000. The Debtor believes that if the secured creditors are no longer able to block all attempts to sell portions of the real properties and with the involvement of Cassidy Turley, further sales

---

[4] The criticism of Mr. Pierce and his management of the Debtor seems to be a precursor to and a thinly veiled request from the opposing creditors to the United States Trustee to seek a trustee's involvement in this case. This issue is discussed in detail below.

DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364

10

can and will be achieved. The Debtor, with the instant motion and other motions to be filed shortly, will be able to prepare and execute a plan of reorganization that will pay all creditors in full.

E.   *Debtor's Alleged Wrongdoings are Irrelevant to this Motion and to this Case in General.*

The opposing creditors raise questions about the managing member, Wayne F. Pierce, and his ability to effectively manage the Debtor. The main thrust of this argument is twofold, they claim Mr. Pierce may have received inappropriate transfers from the Debtor at the inception of the first loan and they question Mr. Pierce's ability to effectively move the Debtor forward post-petition. As indicated above, Mr. Pierce did receive advancements on his management fees at the inception of the loans. This occurred over seven years ago and was made pursuant to a management contract that remains in force today. The distributions themselves were made, not by the Debtor, but by First Blackhawk Financial, the actual holder of the liens and the party that the creditors insisted were to have control of the Debtor's funds. As such, those distributions were made with the full knowledge of the secured creditors. (See Declaration Wayne F. Pierce in Support of Reply, ¶ 4). If, for the sake of argument, those transfers could somehow be considered fraudulent transfers and/or improper distributions, the Debtor and/or a court appointed trustee would have no recourse against Mr. Pierce as the statute of limitations on these payments has long passed. To claim that distributions that Mr. Pierce received over seven years ago under a management contract somehow prevent Mr. Pierce from effectively managing the Debtor or making a decision on the current motion is merely a red herring and has not relevance to the current motion.

Debtor sees no evidence that Mr. Pierce has in any way mismanaged the Debtor in recent years, especially post-petition. There has not even been a suggestion that any post-petition wrongdoing has occurred. As stated above, the Debtor and Mr. Pierce were prevented from moving the Debtor's business opportunities forward by the same opposing creditors that now look to complaint about Mr. Pierce's management on a pre-petition basis. On a post-petition basis, the Debtor has complied with all requirements of the Bankruptcy

Code, is cooperating fully with the United States Trustee and has maintained all of its books and records as an open book. Simply put, the Debtor and Mr. Pierce have nothing to hide. Further, and perhaps more importantly, the Debtor, through Mr. Pierce's management, has identified a well-known, established global real estate brokerage firm to list the Debtor's assets for sale, the Debtor has identified and negotiated with a buyer for one parcel of the Debtor's real properties and will bring a proper motion before the court to approve such a sale, has obtained a mechanism by which the Debtor will obtain a permit for the sand extraction facility despite having little or no liquidity to speak of at this time. The opposing creditors have no basis upon which to claim that the Debtor and/or Mr. Pierce are mismanaging the operations of the Debtor.

F.   *Debtor Has Established Grounds for Section 364(d)(1) for Superpriority Financing*

ERG alleges that the Debtor has failed to satisfy the requirements of 11 USC Section 364(d)(1) to provide the Debtor with super-priority financing. The truth is that the Debtor's motion discussed Section 364(d)(1) and provided substantial evidence in favor of approving the available financing and submits that the moving papers should be enough to approve such financing. ERG places into doubt whether there are other sources of financing available and whether there is enough evidence of a benefit to the estate. The Debtor provided a detailed declaration by Mr. Pierce which plainly set forth all of his efforts to find alternative forms of financing to get this project going, unless the opposing creditors are willing to fund this process on better terms or they have someone that is willing to do so, the court has before it no evidence that any other form of financing is available to the Debtor.

The issue of whether or not the agreement with Freeman Associates benefits the estate has also been addressed by the Debtor. The Debtor has produced substantial evidence that the sand deposit exists. Further, as Debtor explains in its motion, obtaining the permit will clear the path for interested buyers, lessors and/or investors to commence extraction in a much shorter period of time. With the permit in hand, the Debtor anticipates that interest in the sand extraction site will substantially increase and interested entities will be more willing to invest in such a site with the permit already in place.

1   ERG and Mr. Goodrich also raise the issue that this motion is, in essence, a plan of
2 reorganization and that procedures for noticing and approving a plan should have been
3 followed. A look at the actual terms of the financing show that this is simply not the case.
4 The contract calls for a lien to be placed only upon 250 acres of the Debtor's real properties,
5 leaving nearly 6,250 free of that lien. In addition, the actual lien in place will be based on
6 actual expenses incurred by Freeman Associates over several months, currently estimated at
7 $2,000,000. The reimbursement of these expenses and the interest accruing on those funds
8 will be paid out in accordance with bankruptcy procedure, i.e. by a noticed motion. Further,
9 the royalties called for under the contract will also be contingent upon court approval or shall
10 be included in a plan of reorganization that will be subject to the notice and approval
11 requirements. The Debtor is not proposing a plan of reorganization by this motion, he is
12 merely laying the groundwork for the filing of a successful plan of reorganization, without
13 this first step, the Debtor would be stuck in neutral, at least with regards to the very valuable
14 sand extraction site.

G.   *The Success Fee Would Belong To Freeman Associates Alone*

   ERG makes an unfounded allegation that the success fee will in some form or another be shared with the Debtor and/or Mr. Pierce. This is an unfounded claim that has no evidence to support such an allegation. Regardless of the blatantly improper form of this allegation, Mr. Pierce and Mr. Freeman will be available at the May 17th hearing of this matter to swear, under oath, that this is simply not the case.

H.   *Employment of Freeman Associates is Necessary and Reasonable Given the Circumstances.*

   The opposing creditors' final objection is specifically to the employment of Freeman Associates. Specifically, the oppositions all claim that the Debtor is seeking to circumvent the provisions of 11 USC Section 503 and 507 because the claims of Freeman Associates should be treated as administrative claims when paid out. The Debtor agrees. Freeman Associates will not be paid until such time as the Debtor has available funds to pay Freeman Associates and the payment, if done when the bankruptcy matter is still pending, will be done

by and through a motion to compensate Freeman Associates. The only additional item is that Freeman Associates shall have a superpriority lien in place to protect its investment in the Debtor, so to speak. As such, the Debtor is not seeking to circumvent the appropriate form to compensate professionals. It is seeking to employ Freeman Associates under and subject to those provisions of the bankruptcy court that apply to professionals. Debtor is also seeking to provide Freeman Associates with a superpriority lien for its costs and fees as the Debtor has no current liquid assets to provide payment for an administrative claim.

## III.
## CONCLUSION

Based on this reply and the Debtor's original motion, Debtor prays to be authorized pursuant to 11 U.S.C. §327(a), to employ and appoint Freeman Associates to represent the Debtor as Debtor-in-Possession in obtaining all necessary permits and other requirements of the county's planning department, and for a superpriority priming lien pursuant to 11 U.S.C. § 364(d) as necessary to the estate and a vital element in fully realizing a vital element of the Debtor's Plan of Reorganization.

Dated: May 12, 2010

/s/ *John L. Smaha*
John L. Smaha
SMAHA LAW GROUP,
Counsel for Sargent Ranch, LLC,
Debtor and Debtor-in-Possession

W:\Sargent Ranch\Motion.Freeman\104.Reply.Brief.wpd

---

DEBTOR'S MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE
CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364
14

John L. Smaha, Esq. Bar No. 95855
Gustavo E. Bravo, Esq. Bar No. 218752
**SMAHA LAW GROUP APC**
7860 Mission Center Ct., Ste. 100
San Diego, California 92108
(619) 688-1557 Telephone
(619) 688-1558 Facsimile

Attorneys for Debtor, Sargent Ranch, LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROOF OF SERVICE | CASE NO. 10-00046-PB11 |
| | *In re Sargent Ranch, LLC* |

    I am employed in the City of San Diego, California. I am over the age of 18 and not a party to the within action. My business address is 7860 Mission Center Court, Suite 100, San Diego, California 92108.

On May 12, 2010, I caused to be served the following document(s) described as:

1. **DEBTOR'S CONSOLIDATED REPLY IN SUPPORT OF MOTION TO EMPLOY FREEMAN ASSOCIATES AND TO SECURITIZE CONTRACT WITH SUPERPRIORITY PRIMING LIEN PURSUANT TO 11 U.S.C. § 364; MEMORANDUM OF POINTS AND AUTHORITIES;**
2. **DECLARATION OF WAYNE F. PIERCE IN SUPPORT OF DEBTOR'S REPLY;**
3. **DECLARATION OF GUSTAVO E. BRAVO IN SUPPORT OF REPLY**
4. **NOTICE OF LODGMENT**

in this action by placing the true copies thereof enclosed in a sealed envelope addressed as follows:

U.S. TRUSTEE
U.S. Department of Justice
402 West Broadway, Ste. 600
San Diego, CA 92101

| | |
|---|---|
| Cecily A. Dumas<br>Friedman Dumas & Springwater<br>150 Spear Street, Ste. 1600<br>San Francisco, CA 94105<br>(415) 834-3800<br>(415) 834-1044 (Fax)<br>*Attorneys for Frederic Sylvester, Sherie Sylvester, and Jocelyn Sylvester* | Robert N. Phillips, Esq.<br>Jayne Laiprasert, Esq.<br>Howrey LLP<br>525 Market Street, Ste. 3600<br>San Francisco, CA 94105-2708<br>(415) 848-4950<br>(415) 848-4999 (Fax)<br>*Attorneys for Frederic Sylvester, Sherie Sylvester, and Jocelyn Sylvester* |

1

[X]  (**BY MAIL**) I served the individual named by placing the documents in a sealed envelope. I then placed it for collection and mailing with the United States Postal Service this same day, at my address shown above, following ordinary business practice.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **May 12, 2010**, San Diego, California.

/s/ Amelda M. Johnson
Amelda M. Johnson