TROUTMAN SANDERS LLP
Dan E. Chambers (State Bar 156853)
Meghan C. Sherrill (State Bar 259487)
5 Park Plaza, Suite 1400
Irvine, CA  92614-2545
Telephone:      949.622.2700
Facsimile:      949.622.2739
dan.chambers@troutmansanders.com

Attorneys for Creditors
Energy Research & Generation, Inc. (ERG) and
ERG, Inc., Retirement Trust

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re | Case No.  10-00046-PB11 |
| SARGENT RANCH, LLC, | Chapter 11 |
| Debtor. | **NOTICE OF MOTION AND MOTION OF ENERGY RESEARCH & GENERATION, INC AND ERG, INC. RETIREMENT TRUST FOR AN ORDER PURSUANT TO 11 U.S.C. 1104(a) APPOINTING A CHAPTER 11 TRUSTEE OR, IN THE ALTERNATIVE, AN ORDER PURSUANT TO 11 U.S.C. 1112(b) CONVERTING THE DEBTOR'S CASE TO CHAPTER 7; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| | [Filed concurrently with Declarations of Dan E. Chambers, Cindy Mulder, Donna J. Richardson and Donna Anderson; and Request for Judicial Notice.] |
| | Date:    November 22, 2010<br>Time:    3:30 p.m.<br>Dept:    4<br>Judge:  Hon. Peter W. Bowie |

1053923v1

MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. 1104(A) APPOINTING A CHAPTER 11 TRUSTEE

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

I.    MEMORANDUM OF POINTS AND AUTHORITIES ..................................... 3

    A.    INTRODUCTION ............................................................................... 3

    B.    SUMMARY OF BASIS FOR MOTION ................................................. 4

        1.    Genesis of This Case and Current Status ..................................... 4

        2.    Appointment of a Chapter 11 Trustee Is Warranted Due to Acts of Dishonesty, Incompetence, and Gross Mismanagement, and the Need to Protect the Debtor's Estate from Further Harm ............................ 5

        3.    Appointment of a Chapter 11 Trustee Is Warranted Due to Managerial Incompetence and Is in the Best Interests of Creditors............ 5

        4.    The Confluence of Factors Demonstrates Ample Cause for Appointment of a Trustee under 11 U.S.C. §§ 1104(a)(1) and (a)(2)......... 6

    C.    FACTS ............................................................................................. 6

        1.    The Loan Transactions and Default ............................................. 6

        2.    Case Background .......................................................................... 7

    D.    PIERCE'S MISAPPROPRIATION AND SELF-DEALING.............................. 11

        1.    Pre-payment of Rents Under Leases Directly to Pierce............................. 12

        2.    "Loans" of Lender Monies to Pierce and Others Without Disclosure to the Lenders.......................................................................... 13

        3.    "Protective Advances" of Lender Funds Monies to Other Pierce Projects.................................................................................... 15

        4.    Conflicting Versions of the Debtor's Operating Agreement .................... 16

        5.    Fraudulent and Criminal Activity of Pierce ............................................. 17

    E.    LEGAL ARGUMENT ......................................................................... 18

        1.    Appointment of Chapter 11 Trustee is Warranted Under Sections 1104(a) and (a)(2) of the Bankruptcy Code ............................................. 18

        2.    Alternatively, this Chapter 11 Case Should be Converted to a Chapter 7 Case Under Section 1112(b) of the Bankruptcy Code ............. 24

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

- i -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Altman,*
230 B.R. 6 (Bankr. D. Conn. 1999), affd, 254 B.R. 509 (D. Conn. 2000) ...................... 18

*In re Colorado-UTE Electric Association,*
120 B.R. 164 (Bankr. D. Colo. 1990) ............................................................ 21

*In re Concord Coal Corp.,*
11 B.R. 552 (Bankr. S.D. W. Va. 1981) ................................................... 21, 23

*In re Euro-American Lodging Corp.,*
365 B.R. 421 (Bankr. S.D.N.Y. 2007) ("Unlike § 1104(a)(1) .................................. 20, 21

*Grogan v. Garner,*
498 U.S. 279, 111 S. Ct. 654 (1991) ............................................................ 18

*In re Intercat, Inc.,*
247 B.R. 911 (Bankr. S.D. Ga. 2000) ........................................................... 22

*Ionosphere Clubs, Inc.,*
113 B.R. 164 (Bankr. S.D.N.Y. 1990) ..................................................... 20, 21, 23

*In re La Sherene, Inc.,*
3 B.R. 169 (Bankr. N.D. Ga. 1980) ............................................................. 19

*In re Lizeric Realty Corp.,*
188 B.R. 499 (Bankr. S.D.N.Y. 1995) ........................................................... 24

*Loop Corp. v. United States Trustee (In re Loop Corp.),*
379 F.3d 511 (8th Cir. 2004) ................................................................... 25

*In re Main Line Motors, Inc.,*
9 B.R. 782 (Bankr. E.D. Pa. 1981) ........................................................... 19, 20

*In re Marvel Entertainment Group, Inc.,*
140 F.3d 463 (3d Cir. 1998) ................................................................. 19, 20

*In re McCorhill Public, Inc.,*
73 B.R. 1013 (Bankr. S.D.N.Y. 1987) ........................................................... 23

*Midatlantic National Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.),*
4 B.R. 635 (Bankr. E.D.N.Y. 1980) ............................................................. 20

*In re Oklahoma Refining Co.,*
838 F.2d 1133 (10th Cir. 1988) ................................................................ 19

- i -

**TABLE OF AUTHORITIES**
(continued)

Page

*In re PRS Insurance Group, Inc.*,
    274 B.R. 381 (Bankr. D. Del. 2001) ................................................................ 22

*In re Sharon Steel Corp.*,
    871 F.2d 1217 (3d Cir. 1989) ("Subsection (a)(2) ........................................... 20

*In re The Bible Speaks*,
    74 B.R. 511 (Bankr. D. Mass. 1987)................................................................. 24

*In re Tradex Corp. v. Morse*,
    339 B.R. 823 (D. Mass. 2006) ......................................................................... 18

*V. Savino Oil*,
    99 B.R. at 525 ("Once the court has found that that cause exists under §
    1104(a)(1), there is no discretion; an independent trustee must be appointed.")........ 19, 24

*In re William A. Smith Construction Co.*,
    77 B.R. 124 (Bankr. N.D. Ohio 1987) .............................................................. 19

**DOCKETED CASES**

*Sargent Ranch, LLC v. First Blackhawk Financial Corp. et al.*,
    Adversary No. 10-90467-PB.................................................................................. 9

**STATUTES**

11 U.S.C. §§ 1104(a)(1)................................................................................. 18, 19

11 U.S.C. § 1112(b)(1)................................................................................... 24, 25

**MISCELLANEOUS**

5 COLLIER ON BANKRUPTCY § 1112.03(2) (15th ed. 1980)................................ 25

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

- ii -

1  **TO THE HONORABLE PETER W. BOWIE, UNITED STATES BANKRUPTCY**

2  **JUDGE; SARGENT RANCH, LLC, DEBTOR AND DEBTOR IN POSSESSION, AND ITS**

3  **COUNSEL OF RECORD; OFFICE OF THE UNITED STATES TRUSTEE; AND**

4  **PARTIES REQUESTING SPECIAL NOTICE:**

5    **PLEASE TAKE NOTICE** that on November 22, 2010 at 3:30 p.m., or as soon thereafter

6  as the matter may be heard in Department 4 of the above-captioned Court, Energy Research &

7  Generation, Inc. ("ERG Inc.") and ERG, Inc., Retirement Trust ("ERG Trust, and together with

8  ERG Inc., "ERG"), each a secured creditor herein, will and hereby does move the Court for an

9  order pursuant to section 1104(a) of title 11 of the United States Code (the "Bankruptcy Code")

10  appointing a chapter 11 trustee to administer the assets of Sargent Ranch, LLC, the debtor and

11  debtor in possession in this case (the "Debtor") or, alternatively, an order of this Court converting

12  this chapter 11 case to a case under chapter 7 pursuant to section 1112(b) of the Bankruptcy Code

13  (the "Motion").

14    This Motion is made on the grounds that the Debtor's managing member, Wayne F.

15  Pierce ("Pierce") has acted with fraud, dishonesty and incompetence with respect to the affairs of

16  the Debtor and has grossly mismanaged the Debtor to date.  In addition, appointment of a chapter

17  11 trustee is in the best interests of the creditors and the estate.  In the alternative, this case should

18  be converted into a case under Chapter 7 of the Bankruptcy Code due to Debtor's demonstrated

19  inability to reorganize.

20    / / /

21    / / /

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1053923v1                                          -1-

MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. 1104(A) APPOINTING A CHAPTER 11 TRUSTEE

1    This Motion is based on this Notice of Motion and Motion, the Memorandum of Points

2    and Authorities, the Request for Judicial Notice and exhibits attached thereto, the Declaration of

3    Dan E. Chambers, the Declaration of Donna J. Richardson, the Declaration of Donna Anderson

4    and the Declaration of Cindy Mulder in support of the Motion, all filed concurrently herewith, all

5    of the pleadings and records on file in the case and such other or further argument and evidence

6    as may be presented prior to or at the hearing on this Motion.

7

8    Dated:  October 15, 2010                    TROUTMAN SANDERS LLP

9                                               By: _____ /s/ Meghan C. Sherrill _____
                                                            DAN E. CHAMBERS
10                                                          MEGHAN C. SHERRILL
                                               Attorneys for Creditor Energy Research &
11                                             Generation, Inc. (ERG) and ERG, Inc., Retirement
                                               Trust
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. 1104(A) APPOINTING A CHAPTER 11 TRUSTEE

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   **I.      MEMORANDUM OF POINTS AND AUTHORITIES**

2       **A.      INTRODUCTION**

3           This case presents a textbook example of the need for the appointment of a chapter 11

4   trustee.  The following undisputed facts concerning the fraud, self-dealing, dishonesty, gross

5   mismanagement and incompetence of Wayne F. Pierce ("Pierce"), the managing member of

6   debtor Sargent Ranch, LLC ("Debtor") support this conclusion:

7               --Pierce has admitted under oath that he used funds loaned to Debtor to make loans

8   to himself and other members of Debtor without disclosing those transactions to Debtor's lenders.

9               --Pierce has admitted under oath that he paid himself over $1 million from leases

10  owned by the Debtor without disclosing those transactions to Debtor's lenders.

11              --Pierce has admitted under oath that he made "protective advances" to other real

12  estate development project in which he had an interest through the use of funds loaned

13  specifically to Debtor.

14              --Pierce has admitted under oath that Debtor has two versions of its operating

15  agreement and that one version includes a $750,000 management fee payable to him and changes

16  the assets of the Debtor, all without disclosure to Debtor's lenders.

17              --Pierce has grossly mismanaged other bankrupt (or distressed) real estate

18  development projects that bear striking similarities to Debtor's situation.

19              --Pierce has been the subject of various newspapers articles that detail his fraud,

20  self-dealing and criminal activity with respect to the real estate development project that is the

21  subject of this bankruptcy case, as well as other real estate projects.

22              --Numerous individuals who have loaned money to Debtor has expressed their

23  opinion of Pierce has a dishonest, untrustworthy individual.

24          The totality of these undisputed facts establish grounds for the appointment of a chapter

25  11 trustee in Debtor's chapter 11 case (the "Chapter 11 Case") pursuant to sections 1104(a)(1)

26  and (a)(2) of the Bankruptcy Code.  Pierce has secretly and systematically misappropriated

27  millions of dollars of ERG and other similarly situated creditors' loans for his own personal

28  benefit.   Thus, it is apparent, Pierce has engaged in a course of conduct designed to conceal what

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1053923v1                              - 3 -

1  are — at worst — his prior and continuing acts of dishonesty and misrepresentation and — at best

2  — acts of gross mismanagement and incompetence with respect to the assets of the Debtor's

3  estate, all designed so that Pierce can maintain control over the Debtor's real property as long as

4  possible and line his pockets in the process.

5      In light of these uncontroverted facts, and for all of the reasons set forth more fully below

6  and in the documentation submitted herewith, this Court should now immediately appoint a

7  chapter 11 trustee to manage, administer and oversee the Debtor's estate and assets or,

8  alternatively, immediately convert this Chapter 11 Case to a case under chapter 7 of the

9  Bankruptcy Code.

10      **B.    SUMMARY OF BASIS FOR MOTION**

11          **1.    Genesis of This Case and Current Status**

12      This Chapter 11 Case stems from Pierce's repeated failures to service, and comply with

13  the terms of, the loans made by ERG and similarly situated creditors to the Debtor in the principal

14  amount of approximately $40 million.   Over the course of a protracted period of time, spanning

15  over a decade, in which ERG has sought bona fide operational data and cash flows, evidence of

16  the ability of the Debtor to develop real projects and infrastructure, and ultimately receive some

17  return on its investment, both prior and subsequent to the filing of this Chapter 11 Case, ERG has

18  gained no insight as to how the Debtor can or will rehabilitate itself; especially with Pierce

19  frustrating these efforts.  The wholesale absence of transparency is patently obvious: during this

20  time, Pierce methodically diverted all proceeds for purposes other than the repayment of ERG and

21  other secured creditors and improvement of the property, in violation of the parties' loan

22  documents, and has not completed, or even substantially started, any contemplated developmental

23  projects since obtaining the Sargent Ranch property.

24      Pierce's blatant disregard for his fiduciary responsibilities has continued into this Chapter

25  11 Case, as Pierce has totally ignored the interests of the creditors and the Debtor's inability to

26  service the mounting debt, and has instead focused on the Debtor's future "intentions" for the

27  Sargent Ranch property, all while no development or operations are being conducted on the

28  property and no income is being generated.

1053923v1                                    - 4 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

2.      **Appointment of a Chapter 11 Trustee Is Warranted Due to Acts of**
        **Dishonesty, Incompetence, and Gross Mismanagement, and the Need**
        **to Protect the Debtor's Estate from Further Harm**

The gravity of the information produced concerning Pierce's misappropriation of estate assets for Pierce's own personal interest and his other projects, and Pierce's speculative plans for and fictional prospective valuations of a property which has had zero success, have resulted in a toxic atmosphere and complete absence of trust of Pierce and his retained advisors, rendering any hope for a consensual or expedited resolution of these matters non-existent.

Pierce's brazen and illicit acts pre-date and have continued since the Petition Date (as defined below). In fact, through this Chapter 11 Case, Pierce has engaged in a calculated attack to attempt to void, or alternatively subordinate, the loans of lenders like ERG, and the claims of creditors connected thereto, in order to generate a windfall by distributing at most a return of principal to those lenders who have rode out loans of millions of dollars over the course of several years with no return, or prospect of a return, on their investments. The totality of Pierce's actions and omissions attendant to the management of the Debtor's property and estate shows that Pierce is incapable of discharging his fiduciary responsibilities and thus is not qualified to continue to oversee the affairs of this Debtor.

3.      **Appointment of a Chapter 11 Trustee Is Warranted Due to**
        **Managerial Incompetence and Is in the Best Interests of Creditors**

Further, the Debtor has proven incapable of operating the Sargent Ranch property with any degree of economic rationality or responsibility, and current management is incapable of developing and disposing of the Debtor's assets for a successful and prompt emergence from chapter 11. Even the Debtor's newly approved advisors are hopelessly conflicted, as a matter of bankruptcy law, on the one hand performing investment banking services subject to success fees and commissions, while on the other hand operating as officers and managers of the Debtor. ERG believes the terms of the Watley Group's consulting agreement will only invite and allow the Debtor to accrue more fees to blindly chase additional financing that will ultimately chip

1053923v1

1    away at whatever value the property retains and possibly provide the Debtor with more cash to

2    waste and mismanage.

3         Moreover, while the Debtor continues to attempt to "explain away" Pierce's past and

4    ongoing acts of dishonesty and self-dealing with respect to ERG's collateral - when in fact in

5    furtherance of its fiduciary duty the Debtor should be investigating such dealings as opposed to

6    dismissing them — the Debtor has not accomplished any of the critical and necessary steps to

7    rehabilitate, refinance or develop the Sargent Ranch property.

8              **4.    The Confluence of Factors Demonstrates Ample Cause for**

9                   **Appointment of a Trustee under 11 U.S.C. §§ 1104(a)(1) and (a)(2)**

10        This case cries out for the immediate installation of a disinterested party pursuant to

11   sections 1104(a)(1) and (a)(2) of the Bankruptcy Code, to protect the estate from further acts of

12   misappropriation and misconduct by Pierce, to ensure the Debtor's property is financed and

13   developed properly, to bring a semblance of order to these proceedings, and to facilitate a

14   resolution of this matter in furtherance of the Debtor's fiduciary obligations to its estate and its

15   creditors. ERG respectfully urges the Court to see past the Debtor's litany of excuses for Pierce's

16   inexcusable behavior and wild and hopeless aspirations for projects involving Pierce and grant the

17   instant Motion, thereby putting a final stop to the Debtor's failed control over the Sargent Ranch

18   property and Debtor's manipulation of these bankruptcy proceedings as a means to shield Pierce

19   from responsibility for his own illicit acts.

20        **C.    FACTS**

21             **1.    The Loan Transactions and Default**

22        ERG is, together with numerous other creditors, a beneficiary of certain promissory notes

23   (collectively and as amended, the "Notes") owed by the Debtor, which represent total face

24   principal obligations of approximately $40,000,000 (collectively, the "Loan"). The Debtor's

25   obligation to repay the Loan is partially unsecured and partially secured by first and second Deeds

26   of Trust (collectively, the "Deeds of Trust") on that certain raw land in Gilroy, California,

27   spanning approximately 6,400 acres over 14 separate legal parcels across both Santa Clara and

28   Santa Cruz Counties (collectively, the "Property"). (A third deed of trust was also placed on the

1053923v1                                          - 6 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   Property by subordinated lenders (the "Third Deed of Trust")). It was the intention of the parties

2   that the Loan be utilized for the development of a single project – the Sargent Ranch project –

3   which originally consisted of a master planned community, including golf courses, single-family

4   homes, apartment and condominium buildings and commercial office and retail, and for the

5   possible development and sale of developmental mitigation credits.

6       Pierce, through the Wayne and Marcie Pierce Living Trust, has an undivided 70 percent

7   ownership interest in the Debtor. Arthur Appleton ("Appleton") and Greg Griffin ("Griffin")

8   each allegedly own a 15 percent undivided ownership interest in the Debtor. Pierce Tr. (defined

9   *infra*) at 26:20-27:2. Appleton and Griffin were each 50 percent owners of First Blackhawk

10  Financial Corp. ("First Blackhawk"), the broker and originator of the Loan, at the time the Loan

11  was made. Appleton is also Pierce's father-in-law. Pierce Tr. at 13:24-15:24.

12      In or about April 2004, the Debtor defaulted on its payment on the Notes. On or about

13  July 27, 2009, beneficiaries of the Third Deed of Trust initiated non-judicial foreclosure

14  proceedings against the Property. The foreclosure sale for that portion of the Property located in

15  Santa Clara County was duly notice and scheduled for January 5, 2010. The foreclosure sale was

16  stayed by Debtor's filing of this bankruptcy case.

17      As of early May 2010, the total amounts due and owing under the First, Second and Third

18  Deeds of Trust are approximately $69,719,418, $72,805,613.56 and 14,586,224.21, respectively,

19  making the total amount due the secured creditors under the Loan approximately

20  $157,111,255.77.

21      **2.    Case Background**

22      The Debtor filed its petition for relief (the "Petition") under chapter 11 of the Bankruptcy

23  Code on January 4, 2010 (the "Petition Date") in this Court.

24      After the Petition Date, on February 12, 2010, ERG filed the *Motion of ERG Research &*

25  *Generation, Inc. (ERG) and ERG, Inc., Retirement Trust for Order Determining That Debtor is a*

26  *"Single Asset Real Estate" Entity; Memorandum and Points of Authority Thereof* [Doc. No. 24]

27  (the "SARE Motion") seeking an order determining that the Debtor is a "single asset real estate"

28  entity and should therefore be subject to the strictures of section 362(d)(3) of the Bankruptcy

1053923v1                                   - 7 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    Code.  On August 6, 2010, this Court issued its *Order on Motion for Order Determining that*

2    *Debtor is a "Single Asset Real Estate" Entity* [Doc. No.118] (the "SARE Order"), which granted

3    the SARE Motion and held that the Debtor owned only undeveloped real property that is

4    currently generating no income.  In so holding, the Court reasoned that "intentions do not

5    constitute projects" and "[t]here is no disputing the fact that at the time the case was filed, as well

6    as the time of the hearing, every inch of every parcel of the Property, with the exception of a

7    small portion being leased to third parties, is part of the same operation – namely waiting and

8    planning for future development."  (SARE Motion p. 5, 20-25).

9        Among other filings for relief by the Debtor, the Debtor filed the *Application for*

10    *Employment of the Watley Group, LLC* on July 16, 2010 [Doc. No. 104] (the "Watley

11    Application") which sought, inter alia, approval of the employment of the Watley Group, LLC

12    ("Watley") as the "exclusive investment banker of the Debtor" to "perform investment banking,

13    financial modeling, and consulting services" and to "develop a strategic plan with the Debtor's

14    senior management, directors and consultants" in accordance with an annexed representation

15    agreement between Watley and the Debtor.

16        In response to the Watley Application, on August 2, 2010, ERG filed *ERG and ERG, Inc,*

17    *Retirement Trust's Objection to Debtor's Application for Employment of the Watley Group, LLC*

18    [Doc. No. 115]  (the "Watley Objection").  The Watley Objection sought a denial of the Watley

19    Application on several grounds including (a) the lack of clarity as to how Watley will restructure

20    the Debtor; (b) uncertainty as to the terms, source and use of the contemplated debtor-in-

21    possession financing; and (c) the monetary compensation proposed to paid to Watley, which,

22    among other things, provides for a maximum $50,000 a month consulting fee (from a Debtor with

23    no cash or liquid assets), success fees, and commissions for services related to acquisitions and

24    disposals of the Debtor.[1]

25        Despite the Watley Objection of ERG, this Court issued its *Order on Application to*

26    *Employ the Watley Group, LLC* on September 8, 2010 [Doc. No. 130] (the "Watley Order")

---

[1] The United States Trustee and other parties in interest also filed objections to the employment of The Watley Group.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1053923v1                                    - 8 -

1   which authorized the Debtor to employ Watley for the purposes and functions set forth in the

2   Recitals in the agreement between Watley and the Debtor executed on August 17, 2010 (the

3   "Watley Agreement"), subject to certain terms, conditions, fees and payments set forth in the

4   Watley Order and a *Statement of to Modified Terms of the Court on the Employment of the Watley*

5   *Group, LLC* [Doc. No. 131]. Notwithstanding the modifications by this Court to the Watley

6   Agreement, said agreement creates inherent conflict of interest issues as, among other things, it

7   allows certain employees of Watley to perform CEO management and restructuring services for

8   the Debtor while at the same time allowing these same employees to function as investment

9   bankers with the potential to generate a windfall of "success fees" and other commissions based

10  on their investment banking, acquisition and disposal services.

11      On September 27, 2010 the Debtor commenced an adversary proceeding in this Chapter

12  11 Case styled *Sargent Ranch, LLC v. First Blackhawk Financial Corp. et al.* [Adversary No. 10-

13  90467-PB] (the "Lender Litigation") against First Blackhawk and the lenders that entered into the

14  loans secured by the Deeds of Trust and the Third Deed of Trust (the "Lenders") including,

15  among others, ERG. [Request for Judicial Notice ("RJN"), Exh. A.] The Lender Litigation

16  asserts several claims against the defendants alleging violations of certain real estate multi-lender

17  laws, securities law, and other California civil laws, and seeks, inter alia, to void and rescind the

18  Loan and Deeds of Trust securing ERG's and other Lenders' interests, subordinate the claims of

19  the Lenders including ERG, and recover compensatory, punitive and exemplary damages from

20  the defendants. Specifically, the Lender Litigation baselessly claims that Lenders such as ERG

21  purportedly conspired with or aided and abetted First Blackhawk in "a scheme to prevent Plaintiff

22  from re-paying the Notes so that the Lenders could foreclose on the Property or force a

23  bankruptcy and demand a liquidation" and "implemented this scheme by refusing to allow

24  Plaintiff to sell or finance portions of the Property." Nothing could be further from the truth.

25      Prior to commencing the Lender Litigation, the Debtor filed the *Debtor's Plan of*

26  *Reorganization Dated September 22, 2010* in this Chapter 11 Case (the "Plan"). [RJN, Exh. B.]

27  As proposed, the Plan provides that distributions to each Lender in Class 1, including ERG, shall

28  be (a) secured by a second lien note and deed of trust on the Property issued to a Liquidating

1053923v1                                    - 9 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   Trust (as defined in the Plan) in the amount of $165 million and subordinate to a priming debtor-

2   in-possession financing in an amount not to exceed $20 million; and (b) contingent upon a

3   settlement by each Lender of the Lender Litigation, the amount of which (i) will be determined by

4   taking the gross amount of money lent by such Lender to the Debtor and subtracting any interest,

5   including prepaid interest, paid back to such Lender, and then multiplying this amount by 1.35,

6   and (ii) will be paid over a period of seven (7) years.  If a settlement of the Lender Litigation is

7   not reached with a Lender then such Lender will be relegated to inferior treatment under Classes

8   2 or 3.  Notwithstanding the foregoing, the Plan expressly states that through the Lender

9   Litigation, and for the reasons set forth therein, the Debtor is seeking a judicial determination that

10  the claims of the Lenders be equitably subordinated under section 510 of the Bankruptcy Code

11  and as a result the Debtor has proposed the aforementioned settlement (which is void of any

12  return of interest over the duration of the loans) in an attempt to allow the Lenders to avail

13  themselves of such treatment. In exchange for the distributions under the Plan, as of the Effective

14  Date (as defined in the Plan), all liens and encumbrances on the Property will be eliminated and

15  replaced by the second lien deed of trust held by the Liquidating Trust, and upon confirmation of

16  the Plan all existing deeds of trust in favor of First Blackhawk, including the Deeds of Trust held

17  by ERG, along with any assignments thereon, will be released.  The Plan is facially

18  unconfirmable, as set forth below.

19        Moreover, certain provisions of the Plan provide further evidence of Pierce's continued

20  self-dealing.  For instance, in exchange for Pierce's waiver of his claim for purportedly accrued

21  and unpaid management fees asserted to be in excess of $7 million, Pierce will receive a release

22  from the Debtor of any and all claims that the Debtor might have against Pierce.  In addition, the

23  Plan provides that on the Effective Date, Pierce will be the Managing Member of the Reorganized

24  Debtor and will receive $250,000 annually, subject to adjustment.

25        On October 1, 2010, ERG filed *ERG and ERG, Inc., Retirement Trust's Motion for Relief

26  *from Stay* [Doc. No. 139] in this Chapter 11 Case (the "Lift Stay Motion") seeking relief from the

27  automatic stay imposed under section 362(a) of the Bankruptcy Code on the grounds that the

28  Debtor failed (within thirty (30) days of the entry of the SARE Order) to file and serve a

1053923v1                                    - 10 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    disclosure statement with the Plan, as required under section 1125 of the Bankruptcy Code, and

2    the Plan has no "reasonable possibility of being confirmed within a reasonable time," as required

3    by section 362(d)(3) of the Bankruptcy Code. [RJN, Exhibit C.]  In particular, the Lift Stay

4    Motion contends that the Plan is patently unconfirmable for a number of reasons including, but

5    not limited to, the Plan (a) fails to treat claim in the same class alike in violation of section

6    1123(4) of the Bankruptcy Code; (b) violates the absolute priority rule; (c) is entirely speculative;

7    and (d) professes to grant the Debtor the power to unilaterally waive the most fundamental

8    confirmation requirements that a disclosure statement be approved and a confirmation order be

9    entered before the Plan is effective.

10              **D.**    **Pierce's Misappropriation and Self-Dealing**

11              On March 9, 2010, David Ortiz, an attorney with the Office of the United State Trustee

12    assigned to above-captioned chapter 11 case, conducted a meeting of creditors pursuant to section

13    341(a) of the Bankruptcy Code for the purpose of examining the Debtor (the "March 341

14    Meeting").  The section 341(a) meeting was continued by Mr. Ortiz to April 6, 2010 (the "April

15    341 Meeting").  Pierce provided testimony under oath in his capacity as managing member of the

16    Debtor at both the March 341 Meeting and the April 341 Meeting. A transcript of the March 341

17    Meeting is attached to the Declaration of Donna J. Richardson as Exhibit "A" (the "Mar. 341

18    Tr.").  A transcript of the April 341 Meeting is attached to the Declaration of Donna Anderson as

19    Exhibit "1" (the "Apr. 341 Tr.").

20              On August 25, 2010, Mr. Pierce's deposition was taken at the Law Offices of Cooper,

21    White & Cooper in San Francisco, California (the "Pierce Deposition").  A copy of the condensed

22    transcript (omitting exhibits) of the Pierce Deposition (the "Pierce Tr.") is attached to the

23    Declaration of Dan E. Chambers ("Chambers Declaration") as Exhibit "A".

24              ERG has also identified a collection of newspaper articles from certain local publications,

25    attached to the Chambers Declaration Exhibit "B" (the "Newspaper Articles"), concerning, inter

26    alia, (a) allegations by Pierce's former Roddy Ranch development business partner of fraud and

27    misrepresentation by Pierce in connection with Roddy Ranch; (b) Pierce's failure to pay

28

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   delinquent tax bills to Santa Clara County; and (c) the massive debt, forgery scam, and outcry

2   from environmentalists leading up to the Debtor's Petition.

3       Pierce's testimony at the March 341 Meeting, the April 341 Meeting, and the Pierce

4   Deposition and the content of the Newspaper Articles clearly demonstrates that, among other bad

5   acts, (a) Pierce directly received pre-paid lease payments under certain leases between the Debtor

6   and third-party lessees, thereby paying himself money from the disposition of assets belonging to

7   the Debtor; (b) money from the Lenders was in turn given directly to Pierce, to his father-in-law

8   Art Appleton and to others without disclosure to such lenders; (c) money from the Lenders was

9   given to other real estate development projects in which Pierce was involved and to other third

10  parties as "protective advances" without disclosure to the Lenders; (d) at least two versions of the

11  Debtor's operating agreement exist with differing descriptions of the Debtor's assets and

12  compensation paid to Pierce; and (e) Pierce has a history of engaging in fraudulent activity and

13  gross mismanagement on other real estate development projects, particularly those involving First

14  Blackhawk.

15              **1.    Pre-payment of Rents Under Leases Directly to Pierce**

16      The Debtor's sole source of income, as noted by this Court in the SARE Order, was the

17  prepaid rent from three leases for a cell tower, cattle grazing and a hunting lease (collectively, the

18  "Prepaid Leases"). Pierce testified that during the period of time these Prepaid Leases were under

19  active consideration he took the prepayments, in the form of several checks, as personal income.

20  Mar. 341 Tr., at 5:13-6:12. The prepaid rents received by Pierce from the Prepaid Leases were in

21  addition to other management and consulting fees that Pierce drew under these accounts. Mar.

22  341 Tr., at 6:13-23.

23      Pierce also testified about the Debtor's agreements with Patriot Resources and Liberty

24  Energy (collectively "Patriot") (a 50/50 joint venture) for the extraction of petroleum resources

25  from the Property. According to Pierce, there were separate leases that called for royalty

26  payments to the Debtor. Pierce Tr. at 131:5-132:7; Mar. 341 Tr., at 10:11-12:13. Pierce testified

27  that originally there was only one lease that encumbered 320 acres and had a per barrel royalty

28  payment of 6.25% of the yield in production. This lease was prepaid to Pierce personally for

1053923v1                                    - 12 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1     somewhere between $1.1 and $1.2 million in 2007. Pierce Tr. at 132:8-137:20; Mar. 341 Tr. at

2     14:3-15:22.

3     According to Pierce, the direct payment stream he received from both the lease on the 320

4     acres of the Property and the Prepaid Leases was appropriate because when the Debtor was

5     formed and the Property was contributed to the Debtor, either he or an entity he owned or

6     controlled retained the mineral oil and gas rights (with the exception of a carve out for some

7     agricultural rights), despite there being no documentation at the outset carving out any mineral

8     rights to Pierce. Pierce maintains that the original oil lease and the Prepaid Leases were not part

9     of the Debtor's operating agreement, the royalties were not contemplated to be split with other

10    members, and at some later point this direct payment arrangement was documented through an

11    assignment from the Debtor. Pierce Tr. at 136:16-139:7, 199:18-206:19; Mar. 341 Tr. at 12:14-

12    14:2.

13    Despite receiving personal payments from the proceeds of the foregoing leases, Pierce

14    could not recall if at any time he disclosed his position to the Debtor's lenders that such leases

15    were not part of the Debtor's assets. Pierce Tr. at 139:8-140:18, 146:2-149:14. In fact, Pierce

16    testified that as the managing member of the Debtor, his duty is to report financial transactions

17    that impact the company to First Blackhawk and he does not know if he has a fiduciary duty to

18    disclose such information to the Lenders. *Id.*

19    The balance of the Property, consisting of the remaining 6,080 acres, is subject to a lease

20    with Patriot that yields a per barrel royalty payment of 4.125% of net production. Pierce Tr. at

21    218:3-15; Mar. 341 Tr. at 17:14-21. Pierce testified that this lease was part of the Debtor's assets

22    as opposed to being his personally, and if Patriot begins producing or pulling wells, royalties,

23    which have not to date ever been paid, may begin to be paid to the Debtor under this lease

24    sometime in 2011.

25          **2.    "Loans" of Lender Monies to Pierce and Others Without Disclosure to**

26                  **the Lenders**

27    Pierce further testified that in lieu of his $750,000 annual compensation, as managing

28    member of the Debtor, he was paid approximately $3 million in the form of a loan from First

1053923v1                                    - 13 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   Blackhawk. According to Pierce, the Debtor has never had a bank account, and the payments to

2   Pierce in the form of loans instead of a fee was a decision made by First Blackhawk. Pierce

3   asserts, as reflected on the Debtor's Schedule F [Doc. No. 1], that he has a claim for accrued

4   management fees in excess of $7 million that should be offset against any "loans" he has

5   received. Pierce further testified that Appleton and Griffin also received payments classified as

6   "loans." Pierce Tr. at 78:7-80:24; Mar. 341 at 19:1-26.

7       Astonishingly, despite (a) Pierce's relationship to Appleton (his father-in-law), (b)

8   Pierce's admissions of transfers of "loans" of lender money from First Blackhawk to himself and

9   Appleton, among others, and (c) his prior fractionalized financing endeavors with, and through

10  First Blackhawk, on other speculative properties and failed developments, Pierce, through the

11  Debtor in this Chapter 11 Case, has alleged that it was the Lenders whose very loans lined the

12  pockets of Pierce and his family for years that had engaged in a scheme with First Blackhawk to

13  prevent the Debtor from repaying them their Loans. Apart from how illogical this argument is,

14  the simple truth is that the Debtor's bogus allegations are the clearest example of the pot calling

15  the kettle black. Pierce's involvement with First Blackhawk with respect to the Property was

16  familiar territory for him.

17      On a myriad of occasions, including the Roddy Ranch and Mare Island properties, Pierce

18  worked with First Blackhawk to originate and sell fractionalized debt interests to lenders.

19  Attached to the concurrently filed Request for Judicial Notice is a sampling of pleadings from a

20  bankruptcy filed in 2002 in the Northern District of California, *In re Merchant Land Fund, I,*

21  *LLC*, case number 02-43663 ("Roddy Ranch Bankruptcy"). Merchant Land Fund I, LLC was a

22  "California limited liability company formed in September of 1997 known as Roddy Ranch,

23  LLC," its sole assets consisted of "approximately 2,156 acres of real property located in Contra

24  Costa County, California," and its managing member and 80% owner was Pierce. RJN, Exhibit F

25  at 3.

26      The facts and circumstances of the Roddy Ranch Bankruptcy are all too familiar. As

27  stated above, Pierce, through Roddy Ranch, LLC, in connection with First Blackhawk, took out

28  loans and sold fractionalized debt interests to lenders, secured by the single asset real property of

1053923v1                                    - 14 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    Roddy Ranch.  RJN, Exhibits D, F.  In the Roddy Ranch Bankruptcy, creditors moved for

2    appointment of a chapter 11 trustee on many of the same grounds presented herein.  The Motion

3    to Appoint a Chapter 11 Trustee filed in the Roddy Ranch Bankruptcy ("Roddy Ranch Trustee

4    Motion") stated that "Debtor has propounded plans that constitute nothing but risky development

5    schemes that rest on little more than continued forebearance by, and continued risk of loss to," the

6    creditors therein.  RJN, Exhibit D at 3.  The Roddy Ranch Trustee Motion goes on to argue that

7    "Debtor has failed to demonstrate any ability to generate income of the magnitude needed to

8    repay the claims" of its creditors and complains of the insider relations between Pierce and First

9    Blackhawk, the fraud and mismanagement committed by Pierce and Pierce's inability to

10   "investigate and prosecute for the benefit of all creditors…all of the estate's causes of action…."

11   RJN, Exhibit D at 1-3.  On July 21, 2003, the court in the Roddy Ranch Bankruptcy granted the

12   Roddy Ranch Trustee Motion and issued an order appointing a chapter 11 trustee.  RJN, Exhibit

13   H, Docket No. 218-219.

14               **3.      "Protective Advances" of Lender Funds Monies to Other Pierce**

15                         **Projects**

16               Pierce also unabashedly admits that the Lenders' funds that were provided to the Debtor

17   were used to pay the expenses and other costs associated with the Roddy Ranch and Mare Island

18   properties and to make interest payments to other First Blackhawk lenders in the Roddy Ranch

19   and Mare Island properties, each of which is owned, directly or indirectly, by Pierce.  These

20   disbursements were couched as "protective advances".  According to Pierce, he was advised by

21   Griffin that the funds were being used other than for the Property because Pierce had a personal

22   guarantee on the Roddy Ranch and Mare Island loans, and if anything happened to the equity or

23   the other properties which were Mare Island and Roddy Ranch, it would affect his personal

24   guarantee and therefore reduce his pledge of ownership interest. Pierce Tr. at 225:13-227:1; Mar.

25   Tr. at 19:1 Pierce testified that approximately $1.5 million of the Debtor's money from the

26   Lenders was paid out for various costs associated with Mare Island and Roddy Ranch.  Pierce Tr.

27   at 227:2-13.

28

MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. 1104(A) APPOINTING A CHAPTER 11 TRUSTEE

### 4.    Conflicting Versions of the Debtor's Operating Agreement

Two versions of the "Operating Agreement Sargent Ranch LLC" have been produced by the Debtor: (a) an original version dated May 31, 2000 and attached to the Chambers Declaration as Exhibit "C" (the "Original Operating Agreement") and (b) a later version, which bears a date of May 30, 2000 but was executed sometime after the Original Operating Agreement, and attached to the Chambers Declaration as Exhibit "D" (the "Modified Operating Agreement"). See Pierce Tr. At 195-196. Section 2.5 of the Original Operating Agreement provides that "[t]he Company will be formed for the purposes of acquisition, real estate development, management and such other lawful activities as the members may decide to pursue", while Section 2.5 of the Modified Operating Agreement provides "[t]he Company will be formed for the purposes of acquisition, real estate development, management and such other lawful activities as the members may decide to pursue **pertaining to the subject real and personal property identified in Exhibit A**."

Additionally, Section 5.5 of the Original Operating Agreement provides "[a]ll of the assets of the Company, whether real or personal, shall be held in the name of the Company", while Section 5.5 of the Modified Operating Agreement provides that "[a]ll of the assets of the Company, whether real or personal, shall be held in the name of the Company. **Current assets of the Company are listed in Exhibit A**." Chambers Declaration, Exhibits C-D.

These conflicting provisions cast serious doubt on Pierce's contention that the prepaid leases referenced above were his personal assets rather than assets of the Debtor.

The two operating agreements have very different versions of what Pierce was to be paid as compensation as well. Section 5.3 of the Original Operating Agreement provides: "The Members as such shall not be entitled to compensation for their services." Chambers Declaration, Exhibit C. Section 5.3 of the Modified Operating Agreement, prepared by Pierce "more than a year, less than five after creation" of the Debtor, provides: "[t]he Managing Member shall be paid an annual compensation of Seven hundred and Fifty Thousand Dollars." Pierce Tr. 197:9-10; Chambers Declaration, Exhibit D.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. 1104(A) APPOINTING A CHAPTER 11 TRUSTEE

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    Pierce could not recall exactly when changes were made to the Modified Operating

2    Agreement but testified that those changes made in the Modified Operating Agreement were

3    made when additional members were added to the Sargent Ranch limited liability company, <u>years</u>

4    <u>after</u> the Original Operating Agreement was executed, in order to reflect his personal ownership

5    of the aforementioned leases on the Property and his salary.  Pierce Tr. at 192:10-198:10.

### 5.    Fraudulent and Criminal Activity of Pierce

7    ERG's research about Pierce, his reputation and past business dealings has uncovered that

8    Pierce is an extremely disreputable person with a checkered history of failed projects and the

9    target of allegations of fraud. As far back as 2002, Pierce and his former partner, Jack Roddy, had

10    caused their Roddy Ranch project to file for chapter 11 bankruptcy protection.  Like the instant

11    matter, and the parallels are uncanny, Roddy Ranch involved a failed effort by Pierce to develop a

12    master planned community and golf course on 2,100 acres in northern California, resulting in,

13    among other things, the accumulation of several thousands of dollars in unpaid secured and

14    unsecured back taxes.  <u>See</u> Chambers Declaration, Exh. "B", Newspaper Articles, *Contra Costa*

15    *County, Calif, Wants Developers Taxes,* The Bond Buyer, September 9. 2002.  In connection with

16    the Roddy Ranch project, Pierce created a water utility in Contra Costa County to serve as a part

17    of a public financing authority that was ultimately found to be in violation of state securities laws.

18    Pierce established a similar utility in connection with the Property, the "Sargent Ranch Mutual

19    Water Company," that was banned by the State of California. <u>See</u> Chambers Declaration, Exh.

20    "B", Newspaper Articles, *Land Scheme Banned Before Reaching Sargent Ranch,* The Dispatch,

21    February 14, 2005.

22    In November of 2005, Pierce was sued by his partner Jack Roddy in Contra Costa

23    Superior Court in connection with Roddy Ranch.  Roddy alleged, among other things, fraud and

24    misrepresentation by Pierce and Pierce's wife, and sought compensation for unpaid loans and

25    other lost income.  Roddy also alleged that Pierce diverted money and equipment from Roddy

26    Ranch into his other development projects, namely Mare Island and Sargent Ranch.  <u>See</u>

27    Chambers Declaration, Exh. "B", Newspaper Articles, *Roddy Sues Partner Over Ranch Project,*

28    Contra Costa Times, November 30, 2005.

1053923v1                                    - 17 -

1    As noted herein, and reported at length, and in addition to the foregoing, Pierce has been

2    the subject of (a) a forgery scam involving a Native American tribal leader and applications for

3    tribe recognition, (b) federal scrutiny over his past dealings, and (c) public outcries from

4    environmental groups over the development of the Property.  Accordingly, any prospect of

5    developing the Property under Pierce's mere involvement, let alone stewardship, is all but

6    impossible.  He has no credibility, particularly with the Lenders in this case.  The statements from

7    various Lenders clearly articulate their opinion of Pierce.  Chambers Declaration, Exh. E.

8    **E.    LEGAL ARGUMENT**

9    **1.    Appointment of Chapter 11 Trustee is Warranted Under Sections**

10    **1104(a) and (a)(2) of the Bankruptcy Code**

11    The appointment of a disinterested chapter 11 trustee is warranted under section

12    1104(a)(1) and (a)(2), in view of the extensive pattern of dishonesty, misconduct,

13    misrepresentations, and mismanagement on the part of Pierce.  Section 1104(a) of the Bankruptcy

14    Code provides, in pertinent part, that prior to confirmation of a plan and on request of a party in

15    interest, a bankruptcy court shall order the appointment of a trustee:

16         (1)  for cause, including fraud, dishonesty, incompetence, or gross
             mismanagement, either before or after the commencement of the
17         case, or similar cause, but not including the number of holders of
             securities of the debtor or the amount of assets or liabilities of the
18         debtor;

19         (2)  if such appointment is in the interests of creditors, any equity
             security holders, and other interests of the estate, without regard to
20         the number of holders of securities of the debtor or the amount of
             assets or liabilities of the debtor .. .

21

22    11 U. S .C. §§ 1104(a)(1)-(a)(2) (emphasis added).

23    A moving party has the burden to establish the need for the appointment of a trustee by a

24    preponderance of the evidence.  In re Tradex Corp. v. Morse, 339 B.R. 823, 831-32 (D. Mass.

25    2006); In re Altman, 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999), affd, 254 B.R. 509 (D. Conn.

26    2000).[2]

27    _____

28    [2] Although some courts hold that a party seeking appointment of a trustee has the burden of establishing the need for such appointment by "clear and convincing" evidence, the Supreme Court's decision in

1053923v1                                    - 18 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    Section 1104(a)(1) sets forth a nonexclusive list of factual predicates that support a

2    finding of "cause" for the appointment of a chapter 11 trustee, including "fraud, dishonesty,

3    incompetence, or gross mismanagement of the affairs of the debtor by current management." 11

4    U.S.C. § 1104(a)(1); see also In re Marvel Entertainment Group, Inc., 140 F.3d 463, 472 (3d Cir.

5    1998) (stating that "the language of § 1104(a)(1) does not promulgate an exclusive list of causes

6    for which a trustee must be appointed . . . ."); see In re Main Line Motors, Inc., 9 B.R. 782

7    (Bankr. E.D. Pa. 1981) ($300,000 prepetition transfer from debtor without interest, security or

8    recordation of debt evidenced a sufficient degree of incompetence and mismanagement); In re La

9    Sherene, Inc., 3 B.R. 169 (Bankr. N.D. Ga. 1980) (concluding that while the business enterprise

10   has rehabilitative possibilities, and while current management is imaginative and creative, current

11   management grossly mismanaged the debtor from the outset and only management's prior actions

12   are relevant to the appointment of a trustee).

13   Under section 1104(a)(1) of the Bankruptcy Code, the appointment of a trustee is

14   mandatory if cause is shown. See In re Oklahoma Refining Co., 838 F.2d 1133, 1136 (10th Cir.

15   1988) ("Once a court has found that cause exists under § 1104, it has no discretion, but must

16   appoint a trustee."); V. Savino Oil, 99 B.R. at 525 ("Once the court has found that that cause

17   exists under § 1104(a)(1), there is no discretion; an independent trustee must be appointed."). The

18   court may consider both prepetition and postpetition misconduct of the current management when

19   making the determination that "cause" exists for the appointment of a trustee. 11 U.S.C. §

20   1104(a)(1); In re William A. Smith Constr. Co., 77 B.R. 124 (Bankr. N.D. Ohio 1987)

21   (appointment of a trustee is appropriate where evidence shows that chapter 11 debtor was without

22

23   Grogan v. Garner questioned the propriety of the "clear and convincing" standard in the bankruptcy
     context. See Grogan v. Garner, 498 U.S. 279, 286, 111 S.Ct. 654, 659 (1991).  In that case, the Supreme

24   Court stated that the "preponderance of the evidence" standard is presumed to be applicable in civil actions
     between private litigants unless "particularly important individual interests or rights are at stake." Id. The

25   Supreme Court added that it was "unpersuaded by the argument that the clear-and-convincing standard is
     required to effectuate the 'fresh start' policy of the Bankruptcy Code." Id.; see also 4 Norton Bankr. L. &
     Prac. 2d § 79:4 at 79:14 n. 37 (1997) ("The continuing vitality of the 'clear and convincing' standard for

26   any bankruptcy issue must be questioned, in light of the Supreme Court's comment in Grogan v. Garner.").
     Accordingly, pursuant to Grogan, in the absence of an express congressional direction to the contrary, the

27   requisite burden of proof for trustee motions is preponderance of the evidence. See Tradex Corp., 339 at
     831-32; Altman, 230 B.R. at 16-17.

28

1053923v1                              - 19 -

MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. 1104(A) APPOINTING A CHAPTER 11 TRUSTEE

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   adequate managerial control and depleted corporate assets both prepetition and postpetition); In re

2   Main Line Motors, Inc., 9 B.R. at 784-785 (finding section 1104(a)(1) of the Bankruptcy Code

3   embraces activities either before or after the commencement of a case); Midatlantic Nat'l Bank v.

4   Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.), 4 B.R. 635, 644-45 (Bankr.

5   E.D.N.Y. 1980).

6       Here, the Debtor has taken the Loan, and after purchasing the Property, fully depleted the

7   remainder of the Loan proceeds on interest, expenses, consultations, legal fees, studies, and

8   petitions; yet nothing on the Property has changed in that time.  Despite the Debtor's dreams for

9   the future, the Debtor has not built a single home or a golf course or a casino on the Property, and

10  has failed to extract an ounce of liquid asphalt, sell a unit of its mitigation credits (or secure a

11  permit to do so), break ground on any solar energy facility, or procure a permit to sell sand from

12  the Property.  Pierce Tr. at 178-182.  Clearly, the Property has been grossly mismanaged by

13  Pierce and the Debtor's assets have been depleted under Pierce's regime such that cause exists for

14  the appointment of an independent chapter 11 trustee.  At worst, Pierce has defrauded the

15  Lenders.  At best, he demonstrated his incompetence with respect to developing and managing

16  the Property.

17      Even if a bankruptcy court does not find that "cause" exists to appoint a chapter 11 trustee

18  under section 1104(a)(1), the court may still appoint a trustee if it is in the "interest of the

19  creditors . . . and other interests of the estate" pursuant to section 1104(a)(2). 11 U.S.C. §

20  1104(a)(2); In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989) ("Subsection (a)(2)

21  allows appointment of a trustee when no 'cause' exists."); In re Euro-American Lodging Corp.,

22  365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) ("Unlike § 1104(a)(1), § 1104(a)(2) does not require a

23  finding of fault; the court may appoint a trustee even if no 'cause' exists."); In re Ionosphere

24  Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (stating that section 1104(a)(2) "allows

25  the appointment of a trustee even when no 'cause' exists").

26      Section 1104(a)(2) of the Bankruptcy Code provides a more flexible standard for

27  appointment and gives the court discretion to appoint a trustee "when to do so would serve the

28  parties' and estate's interests."  Marvel, 140 F.3d at 474; Sharon Steel, 871 F.2d at 1226;

1053923v1                                    - 20 -

Ionosphere, 113 B.R. at 168. In determining whether a trustee should be appointed under section

1104(a)(2), courts "look to the practical realities and necessities." Ionosphere, 113 B.R. at 168.

Among the factors considered by courts are: "(i) the trustworthiness of the debtor; (ii) the debtor

in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the

confidence — or lack thereof — of the business community and of creditors in present

management; and (iv) the benefits derived by the appointment of a trustee, balanced against the

cost of the appointment." Ionosphere, 113 B.R. at 168 (citations omitted); see also EuroAmerican,

365 B.R. at 427; In re Colorado-UTE Electric Ass'n, 120 B.R. 164 (Bankr. D. Colo. 1990); In re

Concord Coal Corp., 11 B.R. 552 (Bankr. S.D. W. Va. 1981) (substantial doubt about debtor's

loyalty to rehabilitation goals and lack of creditor confidence justified trustee appointment).

There are many factual scenarios that have been held to support the appointment of a

trustee under section 1104(a), including, but not limited to:

    a.  a history of questionable transactions with companies affiliated with the
        debtor;

    b.  failure to keep adequate records and provide prompt and complete reports
        or other required disclosures;

    c.  acrimony between the debtor and its creditors;

    d.  material conflicts of interest preventing the debtor from discharging its
        fiduciary duties to creditors;

    e.  a lack of confidence in the debtor's abilities to manage its business and
        discharge its fiduciary duties;

    f.  failure to pursue recovery of amounts owed from affiliates or other
        transactions constituting preferences or fraudulent conveyances;

    g.  transfers on the eve of bankruptcy;

    h.  inability of the debtor to formulate a business plan; and

    i.  diversion of funds and misuse of corporate assets.

In this case, the Debtor, through its managing member Pierce, has committed many of

these enumerated misdeeds, any one of which alone is sufficient to support the appointment of a

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1  chapter 11 trustee. This confluence of bad acts only lends further support for the appointment of
2  a trustee.

3      For example, in In re PRS Ins. Group, Inc., 274 B.R. 381, 385 (Bankr. D. Del. 2001), the
4  Bankruptcy Court for the District of Delaware affirmed the appointment of a trustee under
5  1104(a)(1) and (a)(2). The PRS Ins. court found that "diversion of funds and misuse of corporate
6  assets constitute fraud or dishonesty sufficient to warrant appointment of a trustee under section
7  1104(a)(1)." In re PRS Ins. Group, Inc., 274 B.R. 381, 385 (Bankr. D. Del. 2001). In PRS Ins.,
8  the court reasoned that a trustee was necessary because the debtor was controlled by its president,
9  the sole director and sole shareholder, against whom the debtor had significant cause of action for
10  diversion of funds. The court found that the debtor's inability to explain the diversion of assets
11  was "evidence, at a minimum of its incompetence or gross mismanagement and, at the most,
12  evidence of actual fraud." Id. at 387. See. e.g. In re Intercat, Inc., 247 B.R. 911, 923 (Bankr.
13  S.D. Ga. 2000) (diversion of substantial corporate assets to the debtor's management or to other
14  corporations owned by management constituted mismanagement at best and fraud or dishonesty
15  at worse; either warrants appointment of a trustee). Mere speculation as to the legitimacy of the
16  transfers was not sufficient.

17      With respect to the section 1104(a)(2) of the Bankruptcy Code, the PRS Ins. court
18  concluded that given the evidence of significant transfers of assets to the debtor's principal and
19  his family, it was unrealistic to assume that the debtor, if controlled by the principal, would
20  authorize or cooperate in the investigation of such actions, and therefore an independent basis for
21  the appointment of a trustee existed. See Intercat, 247 B.R. at 922-23 (failure of an insider to
22  voluntarily rescind transfers made by debtor to him, his family and other corporations owned by
23  him or to convince the court that he would pursue an aggressive independent investigation or
24  prosecution of litigation to recover those transactions mandated the appointment of trustee). The
25  PRS Ins. court further reasoned that where the debtor had no business operations, as is the case
26  here, the prosecution of such actions was one of the only significant assets the debtor had. Hence,
27  the court concluded that the appointment of a trustee to pursue those actions was warranted and in
28  the best interests of creditors under section 1104(a)(2) of the Bankruptcy Code.

1053923v1

- 22 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA. 92614-2545

1    In a case similar to the one at bar, in In re McCorhill Pub., Inc., 73 B.R. 1013, 1017

2   (Bankr. S.D.N.Y. 1987), the bankruptcy court found the appointment of a chapter 11 trustee

3   appropriate under section 1104(a)(1) and (a)(2) where, among other things, (1) the debtor kept

4   very incomplete and haphazard financial records, (2) the debtor paid substantial operating

5   expenses of related business entities controlled by the same principals without attempting to

6   recover or be repaid for such costs, (3) the debtor made undocumented loans to principals which

7   were not repaid, (4) the debtor was the owner of bank account under the control of employees of

8   related entities, for which debtor had no records and which had been used to pay prepetition debts

9   without authorization of bankruptcy court, and (5) the affairs of the debtor were closely

10   intertwined with those of other entities in which the same principals were interested, so that such

11   principals could not be disinterested in the management of the debtor.

12    Moreover, where there is substantial doubt by creditors about the debtor's loyalty to

13   rehabilitation goals and a lack of creditor confidence, chapter 11 trustee appointment is justified.

14   Concord Coal Corp., 11 BR at 554. Here, as evidenced by Pierce's past business practices and

15   the need for Watley to "engage at the Company PR consultants to create a plan which corrects

16   misconceptions out there about 'Pierce,' the past business of Sargent Ranch, and future business

17   plans for the Company," not only has creditor confidence been lost in the Debtor and Pierce but

18   so has the business community as well. See Chambers Declaration, Exh. B; Ionosphere, 113 B.R.

19   at 168. For years, the Debtor has claimed that Pierce has attempted to secure financing from

20   various sources for new and alternative projects and yet no projects have been financed or

21   developed. The only possible reason for Pierce's failure to procure such financing and commence

22   his envisioned projects is that the project lenders both in and out of the community are

23   understandably skeptical about working with Pierce.

24    Additionally, where animosity exists been the creditor body and the debtor, appointment

25   of trustee may be in the best interests of creditors. For instance, where it appears that no

26   meaningful progress towards reorganization is possible because of deep-rooted animosities

27   between a chapter 11 debtor and its major creditors, an independent reorganization trustee may

28   well be necessary under section 1104(a) of the Bankruptcy Code to insulate the reorganization

1053923v1                                              - 23 -

1    process from paralytic conflict. V. Savino Oil, 99 BR at 527, fn 11.  Moreover, sufficient cause

2    for appointment of trustee under section 1104(a)(2) of the Bankruptcy Code exists where friction

3    between the debtor and its creditors threatens to involve the estate in costly and legalistic

4    bickering over the reorganization process, and when the need arises for a neutral party to mediate

5    disputes between the debtor and the creditors.  In re The Bible Speaks, 74 B.R. 511 (Bankr. D.

6    Mass. 1987).  Animosity between the creditor body and the Debtor can be no more evident than

7    in this Chapter 11 Case where after a decade of squandering the Lenders' loan proceeds and

8    pitching pipe dreams, the Debtor now seeks to rescind the Lenders' loans, subordinate their

9    claims, deprive them of any accrued interest, and force the Lenders' to wait another seven years

10   for the improbable return of only their principal; all while Pierce enjoys a substantial windfall and

11   considerable salary.

### 2.    Alternatively, this Chapter 11 Case Should be Converted to a Chapter 7 Case Under Section 1112(b) of the Bankruptcy Code

Alternatively, this Chapter 11 Case should be converted to a case under chapter 7.

Section 1112(b)(1) of the Bankruptcy Code provides that:

> Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and 1104(a)(3), on request of a party in interest, and after notice of a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion of dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors if the movement establishes cause.

11 U.S.C § 1112(b)(1).

"Cause" under this statute includes: "(A) substantial or continuing loss to or diminution

of the estate and the absence of a reasonable likelihood of rehabilitation;. . . .", and therefore as

stated below cause exists here for the purposes of converting this case to a case under chapter 7 of

the Bankruptcy Code.  11 U.S.C § 1112(b)(4) (A).

The purpose of section 1112(b)(4)(A) of the Bankruptcy Code  is to "preserve estate

assets by preventing the debtor in possession from gambling on the enterprise at the creditors'

expense when there is no hope of rehabilitation." In re Lizeric Realty Corp., 188 B.R. 499, 503

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    (Bankr. S.D.N.Y. 1995) (quoted in *Loop Corp. v. United States Trustee (In re Loop Corp.)*, 379

2    F.3d 511, 516 (8th Cir. 2004)). "Rehabilitation," as the term is used in 11 U.S.C. § 1112(b)(4)(A),

3    means "to put back in good condition; re-establish on a sound, firm basis." 5 COLLIER ON

4    BANKRUPTCY § 1112.03(2) (15th ed. 1980) (quoted in *In re L.S. Good & Co.*, 8 B.R. 315, 317

5    (Bankr. N.D. W.Va. 1980)).

6          A basis for the granting of the instant Motion under section 1112(b)(4)(A) of the

7    Bankruptcy Code exists because, since the Petition Date, there has been a diminution of the value

8    and assets of the Debtor's estate and there appears to be no reasonable likelihood of

9    rehabilitation. Under Section 1112(b), the Court has more than enough cause to convert this

10   case to a chapter 7 proceeding or to dismiss this case, including (a) the continuing, substantial

11   loss to the value of the estate, both because of the lack of any revenue to the Debtor from

12   which it can pay its administrative expenses and because of the inability of the Debtor to develop

13   or sell its assets; and (b) the total lack of any reasonable likelihood the estate will be rehabilitated.

14         The Debtor has little cash and significant debt. As stated above, with the exception of

15   certain prepaid leases, the Debtor's assets consist of raw undeveloped land with only the empty

16   promise of planning for future development. Moreover, the Debtor currently has no apparent

17   funding over the short term. Absent immediate financing, the Debtor must wait on the

18   necessary permits and approvals to then first expend money it does not have on the

19   development of various unsubstantiated projects before it can receive any steady cash flow. At

20   this point, the Debtor lacks any immediate or reliable source of income. Under the circumstances,

21   the Debtor has not shown that it will be able to propose a confirmable plan. The Plan it has filed

22   is fraught with defects which render it patently unconfirmable on its face. Therefore, if a chapter

23   11 trustee is not appointed, this Chapter 11 Case should be converted to a case under chapter 7 of

24   the Bankruptcy Code or dismissed.

25         **WHEREFORE**, for the foregoing reasons, ERG respectfully requests entry of an order

26   directing the appointment of a chapter 11 trustee with respect to the Debtor's estate pursuant to

27   sections 1104(a)(1) and (a)(2) of the Bankruptcy Code, or in the alternative, an order converting

28

1053923v1                                    - 25 -

1   this Chapter 11 Case to a chapter 7 case under section 1112(b) of the Bankruptcy Code or

2   dismissing it entirely; or such other relief as this Court may deem just and equitable.

3

4   Dated:  October 15, 2010                    TROUTMAN SANDERS LLP

5

6                                               By: _____    /s/ Meghan C. Sherrill
                                                         DAN E. CHAMBERS
7                                                        MEGHAN C. SHERRILL
                                                Attorneys for Creditor Energy Research &
8                                               Generation, Inc. (ERG) and ERG, Inc., Retirement
                                                Trust
9

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA  92614-2545

MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. 1104(A) APPOINTING A CHAPTER 11 TRUSTEE